EXECUTIVE CENTERS OF AMERICA, INC., Plaintiff-Appellant, *v.* WILLIAM BANNON, Defendant-Appellee.

Third District   No. 77-507

Opinion filed August 2, 1978.

STOUDER, J., dissenting.

David B. Daley, of Sutkowski & Washkuhn Assoc., of Peoria, for appellant.

Roger E. Holzgrafe, of Westervelt, Johnson, Nicoll & Keller, of Peoria, for appellee.

Mr. PRESIDING JUSTICE BARRY delivered the opinion of the court:

This appeal arose out of a contract dispute between the plaintiff, Executive Centers of America, Inc., and the defendant, William Bannon. Plaintiff brought an action in the Circuit Court of Peoria County for declaratory judgment requesting a declaration that defendant was in breach of the written contract entered into, that the plaintiff was free from any further obligation under the agreement, and for a money judgment for the costs of storing and preserving the golf carts which were one of the subject matters of the contract. Defendant, William Bannon, filed a counterclaim seeking a declaration that plaintiff was in breach of the same contract, a declaration of the rights and liabilities of the parties pursuant to the agreement, and a money judgment against the plaintiff for the value of the golf carts. After a bench trial, the trial court entered judgment for the defendant on his counterclaim and dismissed plaintiff's complaint.

Plaintiff timely brought this appeal which raises three issues for review:

(1). Whether the judgment of the trial court dismissing plaintiff's complaint and awarding judgment to defendant on his counterclaim was against the manifest weight of the evidence, and contrary to statutory law;

(2). Whether the trial court erred in granting defendant a money judgment on his counterclaim;

(3). Whether the trial court erred in refusing to admit certain of plaintiff's exhibits, purporting to be appraisals, into evidence, and in admitting one of defendant's exhibits, also a purported appraisal into evidence.

In April of 1972, the defendant, William Bannon, was engaged by the plaintiff to act as and perform services as golf professional at Pine Lakes Country Club in Morton, Illinois. In connection with that employment, plaintiff and defendant entered into a written agreement which embodied their employer-employee relationship and the duties and obligations of each party. That written agreement also contained a provision by which the defendant was required to purchase 20 used golf carts from the plaintiff to be used at the Pine Lakes Country Club for $13,700. The written agreement also provided that in the event that the employment of defendant by the plaintiff was cancelled the plaintiff would be obligated to repurchase the golf carts. The written agreement, in paragraph 11 thereof, concerning the subject matter of the repurchase of the golf carts provided:

"Said [golf] carts are to be carried upon accounting records at actual cash value (cost less depreciation) with depreciation of [*sic*] schedules to be followed pursuant to accepted accounting principles as agreed to in advance by [Plaintiff] and [Defendant].

If this Agreement is cancelled pursuant to its terms, [Plaintiff] will be obligated to purchase the said motorized cart fleet of twenty carts at book value, less any unreasonable wear and tear, or for the reasonable appraised value, whichever is lower. In the event [Plaintiff] elects to determine appraised value, each of the parties to this Agreement shall name an appraiser, and the average of these two appraisals shall be considered the appraised value."

Defendant's employment as a golf professional at Pine Lakes Country Club with the plaintiff, and the written agreement, were terminated in December 1974. The repurchase clause of the written agreement then became operative. The underlying dispute in this case involves an interpretation of the repurchase clause of the parties' written agreement and specifically whether either or both of the parties fully complied with the terms of said written agreement. Inherent in such a determination is also a question of what the parties meant by the term "book value" of the golf carts.

Following the termination of their business relationship defendant tendered to the plaintiff a document captioned "Depreciation Schedule—Golf Carts—Pine Lakes Country Club," which purported to reflect the book value of the 16 carts then owned by the defendant for the purposes of plaintiff's repurchase.[1] This depreciation schedule was prepared independently for purposes of the repurchase clause. This schedule was prepared by the defendant, and his father who had assisted him in accounting and tax preparation, and was prepared after the termination of the written agreement. No schedule of depreciation other than the one offered initially by defendant to plaintiff was ever maintained. Defendant's Federal income tax returns for the years 1973 and 1974 were not prepared using the depreciation schedule tendered to plaintiff. Defendant's bookkeeping and the depreciation schedule tendered to plaintiff used a four-year useful life for the golf carts with a $200 salvage value with which to arrive at book value for purpose of the repurchase provision, in the written agreement. Defendant's tax returns for the two years used a three-year useful life for the golf carts with no salvage value.

Dissatisfied with the book value as initially presented by the defendant, the plaintiff advised the defendant that it wanted an appraisal of the golf carts pursuant to the terms of their written agreement. Following the parties inability to settle the matter pursuant to the terms of their own agreement, the present lawsuit which originated this appeal began.

■ ■ ■ Plaintiff's first argument is that the written agreement of the parties, and particularly the purchase and repurchase clause, is governed by the Sales Article of the Uniform Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 2—101 *et seq.*). We disagree. The written agreement

---

[1] Defendant had previously sold four of the golf carts.

signed by both plaintiff and defendant is a contract by which the defendant was employed by the plaintiff to act as a golf professional at Pine Lakes Country Club. The arrangement was one whereby the plaintiff agreed to pay defendant for his professional services. The agreement recites many terms concerning the various duties and obligations of both parties to the agreement. Incidental to the defendant rendering the services of a golf professional, part of the consideration for the agreement was that he purchase the 20 electric golf carts from plaintiff to be operated upon the golf course as a service to its customers. The language of the written agreement is peculiar to services and employment relations, and not a sale of goods. The test of the applicability of the Uniform Commercial Code is whether the predominant purpose of the contract is services or sale of goods. (*Bonebrake v. Cox* (8th Cir. 1974), 499 F.2d 951.) We perceive the purpose of the disputed agreement to be one of rendition of services, and only incidentally the sale of goods. The Uniform Commercial Code and the various remedies which plaintiff seeks pursuant to it are not applicable to the present factual situation.

The plaintiff's next argument on appeal is that the judgment of the trial court in favor of the defendant finding plaintiff in breach of the repurchase clause of the written agreement is contrary to the manifest weight of the evidence. It appears from the facts in the record that the dispute over what was meant by "book value" in the agreement arose from defendant's use of one book value for price determination under the parties' agreement and another book value for Federal income tax purposes, and led to the plaintiff's decision to elect the alternate method of computing the repurchase price pursuant to the terms of the agreement by averaging appraisals. The terms of the written agreement are clear with regard to this optional method of pricing the golf carts upon repurchase. The language of the contract and the optional pricing method itself shows that the parties contemplated the possibility of a dispute over the term "book value" as used in the agreement. Upon the plaintiff's rejection of defendant's tendered book value of the golf carts, the optional method of setting the repurchase price by appraisal became operative.

■■ The record clearly supports the conclusion of the trial court that the plaintiff breached the contract to repurchase the golf carts. Defendant did deliver at plaintiff's request an appraisal of the golf carts by David Ogilivie. Mr. Ogilivie testified at trial and identified the appraisal of the carts that he had rendered. The trial court accordingly admitted the appraisal into evidence. Plaintiff had prepared and offered two purported appraisals, both of which were refused admission into evidence by the trial court. Plaintiff's first purported appraisal consisted of a letter from P. B. Schuecking, president of R.S.C., Inc., a golf cart company. Mr.

Schuecking's letter was an offer to buy the golf carts in controversy. At trial Schuecking testified that his letter did not represent an appraisal of the golf carts and that plaintiff had not requested him to make an appraisal. Plaintiff's second purported appraisal was a letter from Jack Kropf, branch manager of E-Z-Go Car Division of Textron, Inc. This letter and its contents reflect an offer to purchase the golf carts or to grant a trade-in value and was not an appraisal. Based upon such evidence the trial court properly concluded that plaintiff's two offered exhibits were not appraisals, and refused their admission into evidence.

Without having an appraisal from the plaintiff and with only defendant's appraisal before the court, the contract requirement of an average of the two parties' appraisals could only equal the amount of defendant's appraisal.

■■ The plaintiff's argument that it did not breach the terms of the written contract is utterly without merit. Defendant was ready and willing to perform his obligations under the contract while plaintiff spent considerable time, both in and out of court, haggling over the price provision in the repurchase clause of the written agreement. The sentiments of the trial judge in reaching his ultimate decision on the law and the facts in this bench trial were accurately expressed in his statement at the close of the case, "I have never seen a more wilful, arbitrary, stubborn refusal to comply with the plain language of the written contract than I have seen here in this case insofar as it pertains to Executive Centers of America * * *." The issues involving which party had performed under the contract and which party had breached concerns a matter of contract interpretation and was essentially a fact question for the trial judge in this bench trial. (*George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1975), 32 Ill. App. 3d 249, 336 N.E.2d 185.) Accordingly a reviewing court will not upset the judgment of the trial court unless it is clearly against the manifest weight of the evidence. (*Elgin Lumber & Supply Co. v. Malenius* (2d Dist. 1967), 90 Ill. App. 2d 90, 232 N.E.2d 319.) We believe the manifest weight of the evidence supports the judgment below.

Plaintiff also argues that the defendant was not entitled, in any event, to a money judgment. The basis for this argument is the limitation of remedy provision of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—703). In light of our decision above that the Sales Article of the Uniform Commercial Code was not applicable, plaintiff's argument is unpersuasive.

■■ In a similar argument, plaintiff asserts that the exhibits it offered to prove the amount of expenses it incurred in preserving and protecting the golf carts should have been admitted into evidence. As we stated earlier the trial court properly found the plaintiff in breach of the parties'

written agreement and not entitled, in any event, to a money judgment for storage and maintenance expense on the golf carts. In light of our concurrence with the trial court that plaintiff breached the written agreement, we also conclude that the plaintiff's offered exhibits in this area were totally immaterial to the issues of the case.

■■■ Plaintiff again argues on the final issue presented for review that the trial court erred in admitting defendant's appraisal exhibit into evidence and in denying admission of plaintiff's two purported appraisal exhibits. As we discussed earlier in the opinion the record amply supports the trial court's conclusion that both of plaintiff's purported appraisals were only an offer to purchase in one case and an offer to purchase or trade-in value in the other. Neither of the exhibits offered as appraisals by plaintiff were in reality appraisals. Plaintiff also argues that defendant's one appraisal exhibit should not have been admitted into evidence. We do not agree. The witness who made the appraisal testified at the trial to making it and that it was his appraisal. His testimony was subject to cross-examination. Plaintiff's hearsay objection to the defendant's appraisal exhibit was not well founded. Plaintiff admits in its brief that given the nature and terms of the parties' written agreement, the appraisal even if it contained hearsay could be properly admissible as evidence in this case. It is well settled that the general knowledge and experience of an expert appraisal witness may be based in part on hearsay and not make his opinion thereby incompetent. *Department of Public Works & Buildings v. Hufeld* (1966), 68 Ill. App. 2d 120, 215 N.E.2d 312.

For the reasons stated the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

SCOTT, J., concurs.

Mr. JUSTICE STOUDER, dissenting:

I respectfully dissent from the opinion of my colleagues. Since the amount of the judgment, $9,760 coincides exactly with the book value of 16 carts as tendered by defendant's exhibit number two, it is clear the trial court considered the book value controlling and entered judgment according to the figures submitted in defendant's exhibit number two. I do not believe the book value as submitted in this exhibit conforms to accepted accounting principles and the trial court erred in relying upon it when entering judgment. Before embarking on a discussion as to this issue, several other points which relate to the relevance of book value merit discussion.

The operative terms of the employment contract, as are set forth by the majority, require repurchase of the golf carts at the lower of "book value" or the average of plaintiff's and defendant's appraisals. For the purposes of simplicity, I will refer to this latter amount as the average appraisal value. There is no alternative method of determining the price to be paid under the repurchase provision, contrary to the suggestions of the majority. Both the book value and average appraisal value are relevant to determining the purchase price, but only because that price would be the lower of the two.

According to the majority, plaintiff never obtained a proper appraisal and hence the Ogilivie appraisal of $700 per cart provided by defendant must stand alone as the average appraisal value. It should be noted that paragraph 14 of defendant's counterclaim contains what I believe to be a judicial admission that the two letters the plaintiff sought to have admitted were valid appraisals. Furthermore, while Paul Schuecking testified his letter was not an appraisal, Schuecking was called as defendant's witness and testified that the fair market value of the carts was $500 to $550, which is the same amount his letter stated these carts with good batteries would sell for at retail. While I believe the majority errs in holding defendant's appraisal to be the only valid appraisal, it is unnecessary to belabor the point further. Even if the plaintiff were successful in using the two letters as appraisals, the amount I consider to be the proper book value would still be lower than the average appraisal value and hence determinative of the repurchase price of the carts.

At the outset, it should be recognized that the purchase price of the golf carts is set by the contract and this price may not necessarily correspond to the actual worth of the carts. The mode of determining the book value or actual value of an asset is generally well established within the accounting profession. During trial, the plaintiff called Gerald Banwart as a witness. Banwart is a certified public accountant and his qualifications as an expert witness were stipulated to by the defendant. Banwart testified that the term book value would mean the original cost of an asset together with any major improvements which extended the life of the asset less any accumulated depreciation which had been taken to date. The following testimony then occurred:

"Q. Is it possible using methods of accounting for one asset to have more than one book value?

A. It is possible to have a different value on a financial statement than on an income tax statement.

Q. How does this difference arise?

A. Well, basically the only difference that would normally arise would be if you used this method of depreciation, you start out

with the same cost value and use the same life, that's your common straight-line for financial statement purposes and the accelerated method for income tax to reduct [*sic*] the amount of taxes.

Q. Presume you were using the accelerated method of depreciation for income tax purposes and straight-line for financial statement accounting purposes, why would there be a variance?

A. Well, if you were using a double declining balance or some accelerated method, depreciation is taken more rapidly in the first years of the asset than the straight-line method. Later the straight-line would catch up and they both would depreciate at the same time.

Q. Will the straight-line more accurately reflect the true value of the asset?

A. Not necessarily, it depends on the type of asset.

Q. Generally, in your experience, have you found it to be the case if a company uses the straight-line method for accounting and tax purposes, would he have two different book values on that particular asset?

A. No, they would be the same."

It should be noted that the only other witness with any experience in accounting was the defendant's father, John Bannon, who was a bookkeeper for a real estate firm and helped defendant prepare his tax returns. Although employed for a number of years in accounting related occupations, John Bannon was never qualified as an expert witness in accounting principles. Hence, Banwart's testimony stands alone as to what constitutes acceptable practices in the accounting profession.

I believe the foregoing testimony establishes that while the amount of depreciation claimed on a tax return may be different from the amount listed on a financial statement, this difference can arise solely by employing a different method of computing depreciation on the tax return than on the financial statement (*e.g.*, double declining balance versus straight-line) and not by utilizing a different salvage value and/or a different useful life. In short, while the formula or method of computing depreciation may differ, the items used in the computation such as cost, useful life, major improvements extending the useful life, and salvage value, must be the same for all purposes.

The tax returns of defendant for the years 1973-1974 were admitted into evidence. On those returns, defendant claimed the golf carts had a three-year useful life with no salvage value at the end of that period. Defendant utilized the straight-line method of depreciation in computing the amount of his depreciation deduction. Yet, defendant's exhibit number two employs the same straight-line method to compute book value, but

instead of using a three-year useful life and zero salvage value, the exhibit uses a four-year useful life and a $200 salvage value.

In light of Banwart's testimony, the only witness qualified as an expert in accounting, the computations contained in this exhibit did not conform to acceptable accounting principles. Plaintiff was entitled to have the book value computed using a useful life of three years, zero salvage value, and the straight-line method of depreciation. Since the original cost of the carts was ($13,700) and no objection was ever raised to the cost of the major improvements claimed in defendant's exhibit number two, the cost of the carts before depreciation was $18,596. Utilizing 21 months of depreciation, simple calculation reveals the proper book value is $387 per cart. As stated earlier, since this amount is lower than any amount which could be obtained from averaging appraisals, the purchase price of 16 carts should have been $6,192. I believe the judgment in favor of defendant for $9,760 should be reduced to this figure.