LINDA L. SMITH, Plaintiff-Appellee, *v.* JAMES M. JOHNSTON, SR., Defendant-Appellant.

Second District No. 78-462

Opinion filed July 2, 1979.

Brady, McQueen, Martin, Callahan and Collins, of Elgin, for appellant.

Harold J. Spelman and Associates, of West Chicago, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, James M. Johnston, Sr., a real estate broker (operating as Anchor Realty, Inc., and under its trademark "Johnston & Associates, Ltd.") appeals from a judgment which awarded the plaintiff, Linda L. Smith, a broker's commission in the amount of $6,752.25. The plaintiff cross-appeals from that portion of the judgment which denied her punitive damages. In issue is whether plaintiff's services as an independent contractor in defendant's office pursuant to a written agreement had been terminated, voluntarily or involuntarily, or whether she had agreed to be replaced by defendant as a "listing associate" before she became entitled to a commission on the "sale" of a particular property.

The resolution of the controversy turns upon the meaning of the terms of the contract and its application to the evidence which the trial court could find credible. Paragraph 5 of the contract entered into between the parties on October 1, 1973, states, as pertinent:

> "The commission to be charged for any service performed hereunder shall be those determined by the Broker, and the Broker shall advise the Sales Associate of any special contract relating to any particular transaction which he undertakes to handle. When the Sales Associate shall perform any service hereunder, whereby a commission is earned, said commission shall, when collected, be divided between the Broker and Sales Associate, in which division the Sales Associate shall receive a proportionate share as set out in the rider attached headed 'Commission Schedule' and the Broker shall receive the balance."

The "Commission Schedule" referred to, provides that where a commission is earned by the brokerage house by the sale of an "exclusive listing," the "Listing Sales Associate" shall receive 25% of the commission; the "Selling Sales Associate" shall receive 25% of the commission; and the brokerage house shall receive the balance, 50%.

Paragraph 13 of the agreement as pertinent states:

"This contract and the association created hereby, may be terminated by either party hereto, at any time upon written notice given to the other. Any listing acquired by Sales Associate and sold prior to, or any sale made by Sales Associate prior to, but closed out after termination of Sales Associate employment, will be paid on the basis of work needed to complete transaction. * * *"

While working in defendant's office, plaintiff contacted Gordon and Alice Mae Walters, husband and wife, of DeKalb and inquired as to whether they were interested in selling two houses (not here involved) which they owned in Elgin. At the time the Walters signed a listing agreement for the houses in defendant's office, the sale of a 135-acre farm in Kane County, owned one-half by an estate in which Mrs. Walters was the executor and one-half by Mrs. Walters was discussed. An exclusive listing agreement was signed on January 18, 1974. At the bottom of the agreement were the words, "listed by Linda L. Smith. Johnston & Associates, Ltd." The agreement by its terms was to run for 6 months. At the expiration of that time, July 18, 1974, the sellers indicated that they wished the Johnston firm to continue to be their exclusive brokers in the matter of the sale of the property. A second exclusive agreement was signed, effective July 19, 1974. On this second agreement, Linda L. Smith's name was deleted, and the name of Mr. Johnston appeared as the listing sales associate. Plaintiff testified that she was not present when this new agreement was signed and did not know about it until several days thereafter. She also testified that she had not agreed to being replaced as listing associate with respect to the firm. Defendant, however, testified that the change in listing associate was made because plaintiff had been unsuccessful in selling the farm. Defendant also testified that plaintiff had admitted her incompetence in handling the farm property and had been agreeable to being replaced by defendant as a listing associate. According to defendant, plaintiff was offered a referral fee of 20% instead of the listing commission, to be paid if plaintiff was still in defendant's office when the farm was sold.

The exclusive listing agreement was renewed in January 1975; and again in June 1975. On all of these occasions Mr. Johnston's name appears as the listing sales associate.

Plaintiff's association with the defendant firm was terminated on August 13, 1975. According to defendant, plaintiff's decision to leave had been made earlier in August and was based on her desire to return to college as a full-time student; but plaintiff testified that she planned to attend college only part-time, while continuing to work as a real estate sales associate. She testified further that defendant had told her on August

8, 1975, that her commission on the farm was going to pay for her education. According to plaintiff, defendant called her into his office on August 13, 1975, and told her that she was "fired." Defendant sent plaintiff formal notice of termination on August 19, 1975.

The farm was ultimately sold to the Kane County Forest Preserve District. Although plaintiff had contacted at least one prospective purchaser for the farm, the representative of the Forest Preserve District had dealt only with defendant. The conveyance of the property to the Forest Preserve District took place some time in November of 1975. Previously the seller and the Forest Preserve District had entered into a contract to convey the premises on or about September 12, 1975. The plaintiff testified that on the Friday preceding August 13, 1975 (which is the day Mr. Johnston "fired" her), she was in the Johnston office when the Walters' came in and went into Mr. Johnston's office, discussed the farm and a phone call was made which she believed was to the attorney for the Forest Preserve District. Plaintiff testified:

> "After they made the phone call, the Walters left and Mr. Johnston went back into his office, very quickly; and he came out screaming, whoopee, the farm is going to be sold. He came out excited and he said to me that my commission on the farm was going to pay for my education, and he was very excited and very happy about it and just thrilled to death."

Mrs. Walters testified confirming the meeting although she was uncertain as to the date, and stated:

> "Well, the sale, we were in his office—Mr. Walters and I were there—and he called Mr. Dunn and made the deal with the county."

The plaintiff also adduced testimony of Mr. Fisher, a real estate broker with 41 years experience in Kane County, to the effect that under the general custom in the Kane County area he could not envision any circumstances where a listing sales associate would cease to be the listing sales associate upon the renewal of an exclusive listing agreement with his brokerage house, absent an agreement between that listing sales associate and his successor. He also stated that the success or failure of a sales associate in selling the property was not a criterion in changing a listing sales person.

Defendant argues that the words "sale" and "sold," as used in paragraph 13 of the contract of October 1, 1973, refer to the day upon which the parties sign a formal, written contract to convey. Here the formal contract was signed on September 12, 1975, and Mr. Johnston argues that since Miss Smith's association with the brokerage house had been dissolved before the contract to convey she was entitled to no commission.

■■ Paragraph 13 of the agreement between these parties supports the conclusion that plaintiff retained her rights as the original listing associate even after the defendant had substituted his name on the "Exclusive Sales Agreement." The language suggests, contrary to Mr. Johnston's claim in his testimony, that Miss Smith may not be deprived of a commission merely because her name was eliminated from subsequent listings after she had acquired the initial listing. An argument can be made that there is some ambiguity in the contract because paragraph 5, which incorporates the "Commission Schedule" labels the one entitled to a commission as a "Listing Sales Associate." However, paragraph 13, fairly read, clearly indicates that where the sales associate acquires a listing and otherwise fulfills her obligations under the agreement, she becomes entitled to the listing sales associate's share of the commission unless she gives up that right voluntarily. Under that view plaintiff's right to a share of the commission would have been perfected at the time she acquired the listing of the farm even if her name were removed as an associate after July 18, 1974, provided she complied with other relevant provisions of the contract. The testimony of Mr. Fisher which was received without objection also supports this interpretation based upon custom and usage in the area.

In fact, defendant does not essentially argue on this appeal that the change in the listing associate's name is determinative. Rather, he argues that paragraph 13 is unambiguous and requires that the listing sales associate be in the brokerage office as of the signing of the formal contract of sale and purchase of the farm, on September 12, 1975; and that her association had been properly dissolved under the terms of the agreement prior to that time.

Paragraph 13 provides that either party can terminate the relationship upon notice; and it is clear from the evidence that defendant terminated the plaintiff and that she did not leave voluntarily. The trial judge found that the events surrounding the termination and the timing of the sale were of some "significance" in his decision; and that he was ruling to avoid an unconscionable result. We cannot conclude, however, that the circumstances were of the extreme and outrageous nature which would permit a court to avoid clear contractual terms. Compare, *e.g.*, *L'Orange v. Medical Protective Co.*, 394 F.2d 57 (6th Cir. 1968). See also *Petermann v. Local 396, International Brotherhood of Teamsters*, 174 Cal. App. 2d 184, 344 P.2d 25 (1959); and *Seidelman v. Kouvavus*, 57 Ill. App. 3d 350, 354-55 (1978).

We do conclude that under the contractual terms the plaintiff was entitled to the commission on the basis of a sale which, in our view, may be found from the evidence to have taken place before Miss Smith was terminated.

The determinative question is what the word "sold" means in the context of paragraph 13. The Illinois Statute of Frauds (Ill. Rev. Stat. 1977, ch. 59, par. 2) appears to use the word "sale of lands" in reference to the actual conveyance of the land. The Illinois Supreme Court, in interpreting the Statute of Frauds, has used the words "convey" and "sell" interchangeably (see *Hagen v. Anderson*, 317 Ill. 173, 177 (1925); and *Ropacki v. Ropacki*, 354 Ill. 502, 507-08 (1933)). But the language of paragraph 13 does not contemplate that "a sale" takes place only at the time of the conveyance of the premises. The language of the paragraph distinguishes between a "sale" made "prior to, but closed out" after a termination. Nor is the term "sale" necessarily referable to the signing of the formal contract to convey which here would be September 12, 1975. This court has held that a sale in the sense of an entitlement to a broker's commission, may take place when the owners and prospective purchasers reach an agreement to sell even though it is not yet memorialized in a writing. See *Wolfenberger v. Madison*, 43 Ill. App. 3d 813, 817 (1976).

■■ ■ Thus, the word "sale" as used in paragraph 13 could refer to the time when the prospective purchaser agrees to the landowners' terms. Of course, this is not the only definition which could reasonably be applied to the word "sale." However, where a word in a contract can mean more than one thing, and there are no other rules of construction that are useful in resolving the ambiguity, the ambiguous word or term will be construed against the author of the contract. (*Riemer Bros., Inc. v. Marlis Construction Co.*, 64 Ill. App. 3d 80, 84 (1978).) Here Johnston authored the contract, and therefore the word "sale," which may have different meanings, must be construed against him and in favor of the plaintiff.

The evidence is supportive of the conclusion that the Forest Preserve District and the owners of the farm had reached an agreement for the sale of the farm on the Friday preceding August 13, 1975, the day Johnston terminated Smith's employment. The court could give credence to the testimony of Miss Smith that "the farm is going to be sold" and that her commission on the farm was going to pay for her education and to the testimony of Mrs. Walters that at that time Mr. Johnston, on behalf of the sellers, "made the deal with the county." Under this view the "sale" occurred prior to plaintiff's termination. She was therefore entitled to her commission as a listing sales associate.

■■ We also conclude that the trial judge properly denied plaintiff's claim for punitive damages from which she has cross-appealed. Punitive damages can be assessed only where the defendant's wrongful action is characterized by wantonness, malice or oppression. (*Roark v. Musgrave*, 41 Ill. App. 3d 1008, 1014 (1976).) As we have analyzed the terms of the agreement there was some ambiguity as to when the "sale" which would entitle the plaintiff to a commission could be said to have taken place.

The agreement did not require either party to give any special reason or cause to dissolve the relationship. Further, as the trial court noted, Mr. Johnston informed Miss Smith after her termination that if she would acknowledge that she had no right to a 25% listing sales associate share of the commission, he would allow her to take a 20% referral fee. Also, there was some evidence that Miss Smith was less than an exemplary real estate saleswoman and that she had failed to come to work on Tuesday, August 12, 1975, the day before she was "fired," despite the fact that Tuesday was one of her work days. The allowance of punitive damages is within the trial court's discretion. (*Queen v. Behm*, 58 Ill. App. 3d 253, 255 (1978).) Under the circumstances we do not find an abuse of discretion.

The judgment of the trial court is affirmed.

Affirmed.

RECHENMACHER and LINDBERG, JJ., concur.