EARL J. NIEMOTH *et al.*, Plaintiffs-Appellants and Cross-Appellees, v. LARRY KOHLS *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division) Nos. 86—3559, 87—99 cons.

Opinion filed May 20, 1988.

Ira J. Bornstein, of Harvey J. Barnett & Associates, Ltd., of Chicago, for appellants.

Bernard L. Rivkin, of Braun & Rivkin, Ltd., of Chicago, for appellees.

JUSTICE MURRAY delivered the opinion of the court:

This appeal arises out of an action brought by plaintiffs, Earl J. Niemoth and Create Acquisitions, Inc. (hereinafter referred to as Niemoth), to recover damages against defendants, Larry Kohls, Robert Lutton and Ebco Realty and Management Company, based upon breach of contract, fraud, and negligent misrepresentation concerning Niemoth's purchase of a realty management business from defendants, and defendants' counterclaim to recover the amount allegedly owed by Niemoth to defendants for the purchase of the business. The circuit court of Cook County entered judgment in defendants' favor on both Niemoth's third amended complaint and defendants' counterclaim, and Niemoth appeals therefrom. Defendants have cross-appealed from the trial court's refusal to allow them to amend their counterclaim after judgment was entered to include a request for attorney fees. For the reasons set forth below, we affirm.

On September 28, 1981, Niemoth purchased the assets of Ebco, which consisted of 37 contracts to manage real estate properties on behalf of condominium associations (valued at $350,000), from defendants Larry Kohls and Robert Lutton, the owners of Ebco. Niemoth formed Create Acquisitions, Inc., to acquire and run the business, which continued to do business under the name of Ebco. According to

the terms of the parties' buy-sell agreement, Niemoth purchased Ebco's assets for $400,000: he was required to pay $1,000 as earnest money, deposit $49,000 in an escrow account to be distributed upon closing, and thereafter to make monthly payments of $4,790.79, minus prorations for certain expenses paid by Niemoth on debts incurred by defendants prior to the sale of the business. If the amount of the prorations exceeded the amount of the first payment, Niemoth was to deduct them from subsequent payments. Niemoth also executed a promissory note in the amount of $300,000, pledging as collateral his beneficial interest in a land trust which held title to his condominium.

Pursuant to the agreement, Niemoth's first payment was due October 15, 1981. When he failed to make the payment, defendants, on November 9, notified Niemoth that they were instituting foreclosure proceedings on his note and would hold a sale of his condominium on December 7. On November 13, Niemoth informed defendants by letter that pursuant to the parties' buy-sell agreement he was entitled to offset $49,457, representing liabilities incurred by defendants prior to the sale of Ebco, against his first 10 monthly note payments. Niemoth thus did not make a payment on November 15 and, on December 4, he filed a "Complaint for Injunction and Other Relief" in the circuit court of Cook County, seeking to stop the sale of his condominium and requesting damages arising out of defendants' alleged breach of contract in "misrepresenting the liabilities of Ebco."

On January 27, 1982, the court entered a temporary restraining order, but conditioned it upon the monthly payment of $3,000 by Niemoth to defendants. Subsequently, based on Niemoth's failure to make the monthly payment to defendants in a timely manner (for which he was held in contempt and assessed $2,000 payable to defendants for attorney fees), the court, on April 29, 1982, ordered him to make the payments directly to the Internal Revenue Service on behalf of defendants. On May 1, 1984, trial commenced on Niemoth's third amended complaint and defendants' counterclaim. On June 3, 1986, the trial court entered judgment in defendants' favor in the amount of $355,244 pursuant to their counterclaim for the balance due under the parties' buy-sell agreement. The court also ordered, based on its findings that although defendants breached the parties' agreement, those breaches were not "substantial," that Niemoth receive credit for the termination charges of Ebco's preexisting computerized telephone system, as well as credit for two management contracts to the date of their expiration which defendants warranted were in existence at the time of the sale but which in fact had been previously cancelled. The court also ordered that Niemoth receive credit, upon proof of pay-

ment by him, for any miscellaneous debts of defendants. The court further granted a directed judgment for defendants on Niemoth's fraud count concerning the termination of two additional management contracts, holding that they were legally terminated by the owners. After entry of its order, the court denied a subsequent motion filed by defendants seeking to amend their counterclaim to include a request for attorney fees.

On appeal, Niemoth contends that: (1) the trial court's findings of fact are contrary to the manifest weight of the evidence; (2) the court improperly granted a directed judgment for defendants on his third amended complaint fraud count; (3) defendants breached the parties' agreement "first" and were therefore barred from recovering on their counterclaim; (4) the trial court incorrectly held that the breaches by defendants which it found to exist were not material breaches; and (5) defendant Kohls breached the agreement by terminating two of the management contracts after the sale of Ebco's assets. In defendants' cross-appeal, the sole issue raised concerns their alleged right to attorney fees.

█ It is well settled that it is within the province of a trial court to determine the credibility of witnesses, the weight to be accorded their testimony, and to resolve inconsistencies and conflicts. A reviewing court will not substitute its judgment for that of the trial court unless its findings are against the manifest weight of the evidence. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 445 N.E.2d 418.) Here, we first observe that although Niemoth's manifest weight of the evidence argument encompasses all issues raised by him, it centers around the intended function of an "Annualized Pro Forma Income Statement" prepared by Robert Galgan, the vice-president of Ebco prior to the sale of its assets. Niemoth contends that the *pro forma* statement represented Ebco's income and expenses for the *past* 12 months of actual operation of Ebco. In support of his contention, he relies on paragraph 2 of the parties' buy-sell agreement, entitled "Representations and Warrantees [*sic*] of Seller and Purchaser," which states as follows:

> "Financial Statements—Sellers will furnish operating statements of the corporation for the years 1980 and 1981 through the month closing. *Said statements shall approximate the annualized proforma income statement attached hereto* as Exhibit D and made a part hereof." (Emphasis added.)

Niemoth reasons that since the agreement required the 1980 and 1981 operating statements to "approximate" the "pro forma" statement, the *pro forma* was intended to be representative of the *past* financial

60

status of Ebco during 1980 and 1981. Because the operating statements showed a large net loss, as opposed to the $86,000 profit indicated on Galgan's *pro forma* statement, Niemoth argues that the *pro forma* did not "approximate" Ebco's true financial status and therefore defendants breached the parties' agreement with respect to the warranties provision.

Niemoth further asserts that defendants' failure to inform him of Ebco's financial operating losses for the previous two years, by providing him with pertinent documents or otherwise, also was a breach of the disclosure warranty of paragraph 11, which provides as follows:

"Disclosure—The Sellers represent that they have made a full and complete disclosure of all relevant factors concerning the financial status of the Corporation, including its expenses and income."

In light of the foregoing, Niemoth contends that defendants breached the parties' agreement first—"before the ink was even dry." Niemoth also argues these points in support of his contentions that the trial court improperly granted defendants a directed judgment on his fraud count, improperly entered judgment in favor of defendants on their counterclaim, and improperly held that defendants' breaches of the parties' agreement were not substantial.

Defendants, on the other hand, contend that the *pro forma* statement was merely a *future* projection of Ebco's expenses and income and, therefore, not actionable as a fraudulent misrepresentation or as a breach of warranty pursuant to their agreement that the operating statements approximate the *pro forma* statement. In support thereof, they point out that the figures in the *pro forma* were based upon Ebco's current bills (two to three months) which were multiplied by a certain number to project the anticipated operating expenses and income for the year following Niemoth's purchase of Ebco's assets. Accordingly, defendants assert that the *pro forma* statement was intended to reflect their opinions solely as to anticipated expenses and income—not factual admissions or warranties of Ebco's past financial profit and loss history.

We first note that because the parties claim that each other has misstated the evidence presented in the record, we have necessarily carefully reviewed the some 2,500-page transcript and find the following facts relevant to the disposition of this issue.

At trial, it was established that Niemoth is an experienced businessman, having earned a master's degree from the University of Chicago in business administration, accounting, and financial analysis. He testified that after Galgan submitted his *pro forma* statement to him,

dated "July of 1981," he requested to see Ebco's past operating statements to compare the figures on the *pro forma* with those of the operating statements. Galgan told him that the current operating statements had not been completed. As a result, Niemoth examined the records of Ebco, which were in disarray due to the fact that its accounting manager had recently quit, and met with Galgan approximately five times between August 1981 and the closing in September to obtain further information about Ebco. He reviewed the documents which Galgan said were used in preparing the *pro forma* and he was never denied a request for any documents. Niemoth also testified that when Galgan submitted the *pro forma* statement to him, Galgan said, "This is what the Company is doing"; "this is what it's done for the last year," "or words to that effect," and that he said "the thing is making $86,000 a year on net profit."

Niemoth also stated that as of September 18, 1981, he knew that Ebco was not, in fact, experiencing an actual $86,000 a year operating profit, *i.e.*, "it looked like now they had some problems on some of their expenses." As a result thereof, Niemoth, after looking at some specific Ebco documents from the past two or three months of Ebco's operation, made his own calculations, modifying Galgan's figures, and arriving at a "worst case scenario" showing a $42,647 net profit. Niemoth also testified that he was aware that the figures regarding income could change depending upon whether the accounts decreased or increased, *i.e.*, whether there were changes in management fees in the future; that the $80,000 figure on Galgan's *pro forma* for its sales division was dependent upon whether Ebco was involved in real estate transactions, *in the future*, made by other real estate brokers for which Ebco received a brokerage commission and, if no such transactions occurred, the line item of the sales division would be zero; and that he knew the president's salary of $24,000 was not included in the payroll line item of the *pro forma* statement. The record further indicates that Niemoth responded affirmatively to questions concerning the fact that most of the income and expenses listed in the *pro forma* were subject to downward or upward adjustments as a whole based on any number of variables encountered in operating a business. Niemoth also stated that in acquiring the assets of Ebco he expected to create a classic corporate "turnaround" of Ebco. He defined a turnaround as "taking a building that was marginally limping along making a little bit of money" and turning it into a "stellar performer." He further testified that he asked Kohls at least five times what the income of the corporation would be and how could he be certain the *pro forma* figures were correct and that Kohls as-

sured him the figures were correct. He also stated that had he seen Ebco's financial statements, he never would have purchased its assets.

Robert Galgan, Ebco's former vice-president who prepared the *pro forma* statement at issue, testified that he had no accounting experience; that in 1981 when Ebco was to be offered for sale, he gave all parties interested in purchasing it the same *pro forma* statement he subsequently gave to Niemoth; and that he prepared the *pro forma* statement by taking current information available in the office regarding income and expenses, and "projected out a 12-month income/expense" based on that information. With respect to an exhibit of plaintiff's showing a $73,606.17 operating loss by Ebco during the last six months of 1980, Galgan testified that he did not consult this document in preparing his *pro forma* because he was not trying to prepare a *financial statement* for a prospective purchaser, but rather an *estimate* of what expenses were going to be for the person buying the business, and that he made the *pro forma* statement the way he did because he did not "know the changes that would come about." Because of the method in which he prepared the *pro forma* statement, Galgan stated it was "his direction to go item by item and explain how we got to the numbers and to make available to Earl [Niemoth] the opportunity to verify whether those numbers were correct or incorrect."

Galgan further stated that he told Niemoth that his salary of $35,000 as vice-president was not included in the *pro forma*, nor was Robert Lutton's "draw" of $24,000 as president, or debt service and legal fees. He also stated, in answer to a question of whether it was part of his job to review and "be aware of" statements of profit and loss of the corporation, that it was not his job but rather the function of Ebco's accounting department and Lutton. Specifically, the following colloquy occurred:

"Q. Did Mr. Niemoth ever ask you for financial statements of the corporation, sir?

A. Income tax statements?

Q. Or statements of profit and loss, any type of financial statements?

A. *** He certainly asked for the year-end financial statements which I was unable to provide him because I don't think they were done at the time.

＊ ＊ ＊

A. Did I ever tell him that the company operated at a loss? I did tell him that if the company was making a significant

profit it wouldn't be selling it."

Galgan also testified that he told Niemoth the income tax return was not completed. Finally, Galgan testified that he never told Niemoth he "went back 12 months" in preparing the *pro forma* figures, nor did he warrant or guarantee the figures on the *pro forma*.

Kathy King, Ebco's accounting manager prior to the sale of its assets, also prepared a *pro forma* statement of Ebco's income and expenses. At trial, she defined a *pro forma* statement as a projection of the income and expenses for the upcoming year. She stated that she did not know what information Galgan used in preparing his statement, but that she used bills and findings since the new year, "so it would have been July 1, 1981 through September 1981"; that she did not use any monthly profit and loss statements in preparing the statement; and that although her *pro forma* differed in some respects from Galgan's, the "bottom line" was approximately the same. She also stated that Niemoth never told her he believed either of the *pro formas* was an historical statement of the *past* 12 months.

King further testified, in response to a question of whether Niemoth ever asked her if the company was making or losing money before September 28, 1981, that "[w]e discussed the idea. *** I emphatically told him that it was my opinion that the company could not continue with the insurmountable amount of debt service it had been forced to handle, and that the fact that if there was an owner that came in that intended to take money and a salary or a draw or heavy expenses from the company, they could not function, there was no hope for them, and that unless the owner was cognizant of these facts, he would not—you know, the company wouldn't survive." She also stated that upon expressing her concern to Niemoth about Ebco's debt service and the eventuality of cash shortages, he told her he would write her a check for the shortage, *i.e.*, that "he would guarantee that he would cover any losses that Ebco might sustain in the future months." Niemoth also told her that he wanted to purchase Ebco to "turn the company around"; "he felt there was a great amount of clout to be earned by putting that money [from the contracts] in a bank where he did business," and to sell tax losses of the company and use the proceeds as a base for another venture. At the same time, she also stated that Niemoth never told her in specific words that he bought Ebco so he could make a loss except in the context of her previous discussion with him regarding selling the loss of the depreciation of the management contracts and the expenses incurred.

Michael Bergquist, a bank executive of the bank where Niemoth did business, stated that Niemoth offered to and did transfer to the

bank "maybe 20 or 30 deposits," but that depositing the security deposits that went along with the management company was a consideration, not a requirement, in making a loan to him. Bergquist also testified that the reason for the loan was to help improve Niemoth's liquidity position and that Niemoth subsequently used the loan to purchase an interest in a building (Cornell Towers). Bergquist further stated that Niemoth told him both orally and in a letter that he wanted to make Ebco into a classic corporate turnaround and that the bank anticipated Niemoth would not lose the Ebco contracts/accounts, but that he would increase them.

David Pierce, who was initially hired as president of Create Acquisitions, Inc., after Niemoth purchased Ebco's assets, testified that he found an old Ebco operating statement, which indicated a huge loss, in a file cabinet when he was going through it in "great detail" in April 1982 pursuant to instructions from Niemoth. Pierce also stated that during his employment with Niemoth he was concerned about and discussed with him the potential of cash shortages and that Niemoth promised to cover them. Pierce further stated that in October 1981, immediately after Niemoth's purchase, he and Kathy King prepared, at Niemoth's request, a projected future statement of income and expenses and the same resulted in a "break-even" budget from October to December 1981 "with the present operation," and "showing profits if it got certain accounts that it had proposals on."

Robert Lutton, the former president of Ebco prior to the sale of its assets, testified that he and Lawrence Kohls each owned 50% of Ebco's stock and that Kohls was the chief negotiator in selling Ebco's assets. Lutton further testified that he observed Niemoth going over the *pro forma* with the accounts payable and records of Ebco to verify the revenue and expenses. Lutton stated that he never discussed the profitability of the company with Galgan.

Lawrence Kohls, Lutton's partner and member of the board of directors of Ebco, testified that prior to the sale to Niemoth he discussed with Galgan, Lutton, and King whether the company was making money, but never saw any financial statements although he was sure he received them in the mail; he had no part in preparing the *pro forma* statement, but thought that Galgan, Lutton and King probably did; he never discussed the *pro forma* statement with Niemoth; he opened up Ebco's office and records for Niemoth during a three- to four-week period (*i.e.*, the Ebco file cabinets and all employees were at his disposal); Niemoth attempted to verify the income and expenses listed on the *pro forma* by Ebco; and he negotiated the sale of Ebco with Niemoth over the telephone, in the office and on his boat. With

respect to a particular meeting which took place on his boat, Kohls stated that he and Niemoth discussed the terms and conditions of the sale and that he told Niemoth that there were no profits and that Ebco was not making money. Further, Kohls testified that he never warranted or guaranteed that Ebco would make a profit of $42,647 in the year Niemoth took it over, he never withheld any documents from Niemoth, and that he and Niemoth only discussed the potential of the real estate management business.

In resolving the parties' dispute over the definition of a *pro forma* statement, we first note that it is well settled that "where a word in a contract can mean more than one thing, and there are no other rules of construction that are useful in resolving the ambiguity, the ambiguous word or term will be construed against the author of the contract."[1] (*Smith v. Johnston* (1979), 73 Ill. App. 3d 601, 606, 391 N.E.2d 1092.) Here, as previously mentioned, Niemoth contends that a *pro forma* statement is a past history of a business' income and expenses, whereas defendants argue that it is and was intended as a future projection of a business' income and expenses. Under the foregoing rule, since Niemoth's attorney prepared the parties' agreement, defendants' "future projection" definition must be construed against Niemoth.

We further observe that defendants' definition also prevails under the rule that an ambiguous term can be given a practical construction by a consideration of the purpose sought by the provision in which the term appears, the acts of the parties, and the surrounding circumstances. (*Knowles Foundry & Machine Co. v. National Plate Glass Co.* (1939), 301 Ill. App. 128, 21 N.E.2d 913.) In the present case, we agree with the trial court's finding that the "requirement that the operating statement approximate the pro forma was for the purpose of assuring that the pro forma was accurate [as to those item figures included in the *pro forma*] and that the purchaser knew *what he was buying* and could rely on it." (Emphasis added.) First, as defendants point out, Niemoth was buying Ebco's assets only; he was not purchasing its liabilities. That this was the case is evidenced by Niemoth's own definition of an asset purchase acquisition in which

---

[1]Niemoth cites to *Nardi, Pain & Podolsky, Inc. v. Vignola Furniture Co.* (1967), 80 Ill. App. 2d 220, 224 N.E.2d 649, for the proposition that contracting parties are bound by the terms of whatever agreements they may reach. This case is inapplicable here, however, because *Nardi* holds the parties will be bound to those terms that are *plain and unambiguous*; here, the term *"pro forma* statement" is not unambiguous since it is capable of having more than one meaning as evidenced by the parties' citation to various publications and dictionaries and their dispute over its definition.

only the assets of a company are purchased, as opposed to that of a stock purchase acquisition where "you are purchasing not only the assets but you are also purchasing the equities *and the liabilities* of that corporation." (Emphasis added.) Secondly, the parties' agreement specifically provided that any monies paid by Niemoth for liabilities incurred by defendants prior to their sale of Ebco's assets would result in an offset against Niemoth's monthly payments on his note to defendants. Therefore, since any past liabilities/expenses, which obviously contributed to the operating losses that Ebco had experienced in the previous years (for example, the expenses of Galgan's salary of $35,000, Lutton's draw salary of $24,000, debt service, legal fees, and $70,000 in Federal and State taxes) were not Niemoth's responsibility, there was no reason to expect that they be included in the *pro forma* statement prepared by Galgan and, correspondingly, no reason for Niemoth to believe that the *pro forma* was a "backward" projection of Ebco's past profit and loss history, since its past liabilities would necessarily impact on its past profits and not be accurate as to what Niemoth could anticipate as his own profits and losses once he assumed ownership of the assets.

With respect to the conduct of the parties and the surrounding circumstances, we note that the item figures listed by Galgan were subject to change, as indicated by Niemoth's substantial modification of the figures once he learned that Ebco was not, in fact, experiencing an actual $86,000-a-year operating profit and "it looked like now they had some problems on some of their expenses," and, as a result of his modification, he calculated a net profit of less than half of the amount calculated by Galgan. In addition, Niemoth admitted at trial that a *pro forma* is a "guesstimate" statement, a number of the income items were subject to change depending on whether the contract accounts increased or decreased, whether the sales division was involved in real estate transactions made by other real estate brokers, *in the future*, and that an additional number of income and expense items were subject to downward or upward adjustments as a whole based on certain variables encountered in operating a business. Niemoth also admitted to a number of the witnesses that he intended to change Ebco into a classic corporate turnaround business, *i.e.*, taking a marginally profitable business and turning it into a "stellar performer," which would not have seemed necessary if he originally believed Ebco was making an $86,000-a-year profit.

We further observe that in addition to the foregoing facts, the trial court was in the best position to determine the credibility of the witnesses. With respect to defendants' credibility, the court heard

testimony that although defendants clearly did not specifically apprise Niemoth of their past losses, apparently based upon their contention that the *pro forma* was a future projection, and a number of financial statements were in fact in existence prior to the closing but not directly given to Niemoth, the record indicates that Niemoth was told Ebco was not making money or a profit, that the defendants would not be selling Ebco's assets if it were making a significant profit, and that the company could not survive if the owner intended to take money and a salary *** or heavy expenses from the company." Such statements would obviously contradict an $86,000 profit on the *pro forma* if that *pro forma* was intended as a projection of the past financial history of Ebco. The court also considered the fact that two management contracts were cancelled by defendants' agent prior to the closing, allegedly without defendants' knowledge, and defendants failed to apprise Niemoth of Ebco's contract for its computerized telephone system, which the court subsequently held as breaches of the parties' agreement, which is discussed below.

With respect to Niemoth's credibility, it is undisputed that Niemoth was an experienced businessman, having earned a master's degree from the University of Chicago in business administration, accounting and financial analysis. At the same time, although he testified that he was told by Galgan that Ebco was making an $86,000-a-year profit, which he modified to $42,647, we note that had he merely deducted Lutton's salary of $24,000, which he knew was not included in the payroll line item, his $42,647 profit would have dwindled down to $18,647. This amount would have been subject to a further decrease pursuant to Galgan's disputed testimony that he told Niemoth that not only was Lutton's $24,000 salary not included in the *pro forma*, but also that his salary of $35,000 as vice-president was not included nor were the debt service and legal fees. Further, Niemoth testified that his "worst case scenario" only pertained to the $42,647 figure, *i.e.*, if the "worst" happened according to his modification of the *pro forma* figures, he would still make a profit of $42,647. At the same time, however, Niemoth admitted that he had not deducted an amount as a salary for his ultimate choice of president (Pierce) and, in fact, he stated that he subsequently hired Pierce at $36,000 per year, increased Kathy King's salary by $5,000, increased another employee's salary by $2,000, and increased other employee salaries. Accordingly, we must assume that Niemoth's assertion that he expected Ebco to make at least a $42,647 profit did not carry much weight with the trial court. Additionally, Niemoth admitted that most of the "liabilities" of Ebco which he alleged he was

entitled to offset against his first 10 monthly note payments had not been paid by him as required by a provision of the parties' agreement before he was entitled to offset them (*i.e.*, out of the $49,457.23 claimed, he had in fact subsequently paid only $1,920); he intentionally misrepresented certain auto allowance expenses for 83 months by overstating their amount (instead of $250 per month he listed them as $350 per month); and he intentionally lied to his attorney for the purpose of deceiving him and the court that he had paid the $3,000 payments he was ordered by the court to make to defendants (for which he was held in contempt of court and ordered to pay defendants $2,000 as attorney fees).

In light of the foregoing facts, the trial court's finding that Niemoth was "incredible," the ambiguous nature of the term "*pro forma* statement" and the purpose of the provision, the conduct of the parties, and the surrounding circumstances, we cannot say that the court's finding on the issue of the function of the *pro forma* statement was against the manifest weight of the evidence.

We next address Niemoth's contention that the trial court improperly granted a directed judgment for defendants on his fraud count. He bases his argument on the alleged inaccuracy of the *pro forma* statement and the failure of defendants to produce Ebco's operating statements. Correspondingly, he attacks the trial court's findings that "(1) plaintiffs failed to establish defendants intended to mislead plaintiffs or alter the financial figures of Ebco in any way, (2) plaintiffs had a full and fair opportunity to review and in fact did review the financial records of Ebco, and (3) plaintiffs did not rely upon the proforma and in fact made substantial changes thereto after reviewing the records made available to them by defendants."

In Illinois, fraud is never presumed, but, rather, must be proved by clear and convincing evidence. (*Ronan v. Rittmueller* (1982), 105 Ill. App. 3d 200, 434 N.E.2d 38.) To establish fraud, the following elements must be proved: (1) that a misrepresentation of fact was made, (2) that the misrepresentation was made for the purpose of influencing a party to act, (3) that it was untrue, (4) that the party making the misrepresentation knew or had reason to believe the misrepresentation was untrue, (5) that the person to whom the statement was made believed the statement and acted in reliance on it, and (6) that the statement was material to the alleged fraud. *Mercado v. United Investors, Inc.* (1986), 144 Ill. App. 3d 886, 494 N.E.2d 824.

We first note, as stated above, that the *pro forma* statement at issue in the present case was a *future* projection of Ebco's income

and expenses, not a past historical operating statement. It is well settled in Illinois that although representations as to the past income of a business are actionable, representations as to future income are not. (*Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393.) Accordingly, the trial court properly entered a directed judgment in defendants' favor on Niemoth's fraud count.

█ We further observe, assuming *arguendo* that the *pro forma* was not a future projection, that Niemoth would not prevail on this issue due to his failure to establish by clear and convincing evidence the requisite elements of fraud. He merely relies on the fact that the operating statements disclose a large loss as opposed to the profit stated in the *pro forma*, and Galgan's disputed statement to him that the *pro forma* was a representation of "what the company was doing." However, with respect to the alleged misrepresentations in the *pro forma*, Niemoth presented no expert witness to make a line-by-line comparison of the items listed in the *pro forma* and the operating statements indicating they were actually misrepresented. Moreover, as mentioned previously, Niemoth only purchased Ebco's assets, not its losses, which apparently were due to certain expenses for which he was not responsible. Accordingly, Niemoth failed to establish the first element necessary to an action based upon fraud, *i.e.*, that defendants misrepresented a fact to him.

Similarly, we find no evidence of fraud in Ebco's alleged failure to disclose its operating statements to Niemoth. Niemoth was apprised that Ebco's records were in disarray (he testified that "their accounting system had broken down, *** [t]hey had to assemble the information" because the accounting manager had quit) and that it was necessary for him to go through Ebco's filing cabinets to obtain the information he sought to verify the *pro forma* figures. This is not like the situation in *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 390 N.E.2d 393, upon which Niemoth relies, where the plaintiffs were told that the records were unavailable because they were being used for tax purposes. Here, although the records were in "disarray," they were nonetheless available to Niemoth and any requests by him for documents were never denied. We find it reasonable to believe, as apparently did the trial court, that the information concerning Ebco's profits and losses was available to Niemoth in the disarrayed records, especially since Pierce, Niemoth's president, in fact later discovered one of Ebco's past operating statements in one of the filing cabinets. Moreover, as noted above, Niemoth failed to offer proof that the items responsible for

the losses indicated in the operating statements affected the accuracy of the items listed in the *pro forma* pertaining to the income from the assets purchased by Niemoth and the expenses attendant thereto. Therefore, since Niemoth offered no proof that the *pro forma* figures did not approximate the comparable item figures in the operating statements, we conclude that defendants' statements and Galgan's that the operating statements were not available was not an untruth and that the operating statements were not material to any alleged fraud.

Niemoth also contends that defendants breached the warranty and disclosure provisions contained in paragraphs 2 and 11 of the parties' agreement, based on his claim that the operating statements did not approximate the *pro forma* and defendants failed to produce Ebco's contract for its computerized telephone system (the Horizon system); that the cancellation of two management contracts prior to the closing constituted a breach of defendants' warranty that all contracts were in full force and effect; and that defendants breached their covenant not to compete by Kohls' action in cancelling two other management contracts after the closing.

■ It is a general proposition of contract law that where a party has materially breached a contract he cannot take advantage of the terms of the contract which benefit him or recover damages from the other party to the contract. (*Robinhorne Construction Corp. v. Snyder* (1969), 113 Ill. App. 2d 288, 251 N.E.2d 641, *aff'd* (1970), 47 Ill. 2d 349, 265 N.E.2d 670.) Whether a party has committed a breach of contract is a question of fact. The judgment of the trial court will not be disturbed unless it is clearly against the manifest weight of the evidence. *Executive Centers of America, Inc. v. Bannon* (1978), 62 Ill. App. 3d 738, 379 N.E.2d 364.

■ Before addressing Niemoth's specific breach of contract arguments, we find it appropriate to note the well-recognized "clean hands" maxim that "equity will not aid any person who has done iniquity or is seeking to take advantage of his own wrong." (*Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 53, 390 N.E.2d 393.) Here, Niemoth initially brought suit for an injunction against defendants based upon his assertions that they misrepresented certain "liabilities" and he was entitled to a setoff of same against his first 10 monthly payments to them on his note. These consisted of the following: $16,185 (Illinois Bell Horizon computerized telephone system); $821 (Dick Saunders, employee); $217.50 (Emma Winkler, employee); $1,135.50 (one-time telephone installation charge); $29,000 (auto allowance for employees 83 months). At trial,

however, Niemoth admitted that he was not entitled to any offset of these amounts prior to actual payment of them and he had not in fact paid these amounts when he wrote defendants saying he was offsetting them against the first 10 monthly payments. Niemoth does not expand on this fact in his brief and apparently relies on his contention that defendants breached the parties' agreement "first" in light of his breach of contract arguments. However, as will be discussed below, we agree with the trial court that the breaches committed by defendants were not "substantial," whereas Niemoth's use of these false "liabilities" to abate his payments to defendants under their agreement should have barred equity to act and constituted a material, and thus the "first," breach of the parties' agreement in that it resulted in his failure to make any installment payments to defendants on his note and, even when, by court order, he was ordered to pay $3,000 per month to defendants, he failed to make the payments and lied to his attorney and the court that he had in fact made the payments.

With respect to Niemoth's specific breach of contract arguments, we find that no breaches occurred based on the *pro forma* statement for the reasons previously stated in this opinion. Nor can we conclude that any breach occurred as a result of defendants' failure to provide Niemoth with the operating statements after the closing since the provision requiring same does not indicate a specific date for submission of those statements.

On the other hand, we agree with the trial court that defendants breached the parties' agreement because they warranted that all management contracts were in full force and effect, when in fact the Village Commons and Meadow Edge contracts had been cancelled prior to the closing by their agent Mark Marinello, and because they failed to give Niemoth the Horizon contract. We further agree with the trial court, however, that these were not substantial or material breaches.

Illinois courts have held that whether or not a breach of a contract is "material" and thereby discharges the other party's duty to perform is a question to be decided on "the inherent justice of the matter." (*Lundberg v. Church Farm, Inc.* (1986), 151 Ill. App. 3d 452, 462, 502 N.E.2d 806.) Of the 37 management contracts, only two did not pass in full force and effect upon the sale. The trial court allowed for the lost income on those two contracts and, similarly, ordered a credit to Niemoth, upon proof of payment, for disconnection of the Horizon telephone system. When one balances the $355,244 due defendants under the contract as compared to the

amounts resulting from defendants' breaches ($1,250 for Village Commons contract; $925 per month until expiration of Meadow Edge contract; $16,185 for disconnection of Horizon telephone system, upon proof of payment; and $1,135.50 for telephone installation charges, upon proof of payment), the inherent justice in this case required a conclusion that defendants' breaches were not material and Niemoth was not discharged from performing under the parties' agreement. In light of the foregoing, therefore, we also find that the trial court did not err in granting defendants judgment on their counterclaim.

Niemoth's final argument concerns the cancellation of two additional management contracts by Kohls after the sale of Ebco's assets (Sherwin-On-The-Lake and North Shore Beach). He contends that Kohls' cancellation of these contracts was a breach of defendants' covenant not to compete. The cancellation letters for both contracts were signed by Kohls as president and developer of the respective condominium associations. Kohls owned an interest in both management contracts and he admitted that it was his sole decision to terminate both contracts and that he wrote the termination letters even though no complaints had been made to Create Acquisitions, Inc., concerning dissatisfaction with Create's management. Accordingly, Niemoth contends that Kohls blatantly breached his covenant not to compete.

■■■ As stated above, a material breach of a contract provision by one party will justify nonperformance by the other party. (*Sahadi v. Continental Illinois National Bank & Trust Co.* (7th Cir. 1983), 706 F.2d 193.) Here, Kohls terminated these contracts *after* receipt of Niemoth's "proration" letters in which he stated his intent not to pay on his note for 10 months. Accordingly, since we have determined that Niemoth was already in breach of the parties' agreement, which discharged Kohls from performing under the agreement, no violation of the covenant not to compete resulted from Kohls' actions.

The last issue presented in this appeal concerns defendants' cross-appeal for attorney fees. Defendants predicate their claim for fees under the provisions of the Civil Practice Law which authorize the awarding of attorney fees for untrue statements. (Ill. Rev. Stat. 1985, ch. 110, par. 2—611.) They also predicate their claim on a provision of the security agreement executed with respect to the payment by Niemoth on his promissory note.

■■■ The statute authorizing fees for untrue pleadings is penal in nature and may be invoked only in cases falling strictly within its terms. (*Fewer v. Grant* (1982), 111 Ill. App. 3d 747, 444 N.E.2d

628.) Since the awarding of fees under section 2—611 of the Code is penal and discretionary, the determination of the trial court should not be disturbed on review unless there is a clear abuse of discretion. *Farwell Construction Co. v. Ticktin* (1978), 59 Ill. App. 3d 954, 376 N.E.2d 621.

 Based on these rigid standards, this court must affirm the trial court's denial of defendants' motion to amend their counterclaim to include attorney fees under section 2—611. In their argument, defendants rely on falsehoods made by Niemoth that the trial court considered in connection with a contempt proceeding which clearly is collateral to the instant case. In the contempt proceeding, the court assessed $2,000 against Niemoth, payable to defendants as attorney fees. To permit another award in part based upon the contempt proceedings would be in effect a dual penalty. We further observe that defendants' reliance on Niemoth's initial false "setoff" allegations and allegations pertaining to a Royal computer (purchased as part of Ebco's assets) in support of their argument for attorney fees is misplaced; those allegations were not renewed in Niemoth's third amended complaint, upon which this matter proceeded to trial. See *Kostbade v. Telford* (1973), 13 Ill. App. 3d 961, 301 N.E.2d 321.

With respect to defendants' claim that their request for fees was proper in connection with the collection on Niemoth's promissory note, we note that this case involved considerably more than the collection of the note. It also involved a consideration of Niemoth's charges of fraud, misrepresentations, and breaches of contract on defendants' part as well as the counterclaim based on the promissory note. To permit fees on the basis that they were only incurred in connection with the collection of a note would be a mockery.

Because we conclude that the trial court did not err in denying defendants' attorney fees, we do not reach the issue as to whether defendants' motion to amend their counterclaim to include attorney fees was filed too late.

For the above reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN and PINCHAM, JJ., concur.