ALAN GOLDENBERG, Plaintiff-Appellee, v. SEYMOUR BAZELL, Defendant-Appellant.

First District (1st Division)   No. 1—89—2819

Opinion filed September 16, 1991.

O'Brien, O'Rourke, Hogan & McNulty, of Chicago (William E. McNulty and Michael Gilman, of counsel), for appellant.

Sugar, Friedberg & Felsenthal, of Chicago (Steve A. Felsenthal, Andrew B. David, and William J. Gigler, of counsel), for appellee.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, the trial court awarded plaintiff Alan Goldenberg $325,000 against defendant Seymour Bazell for breach of an oral contract. Defendant argues on appeal that the trial court: (1) applied the wrong standard of proof in finding the existence of an oral contract; (2) erred in failing to find that plaintiff received full compensation for his services rendered as acknowledged by his endorsement of a check; (3) erred in determining that plaintiff's in-court testimony was credible when it conflicted with his deposition testimony; (4) erred in refusing to allow defendant to impeach plaintiff with a prior inconsistent statement; and (5) that judgment for plaintiff was against the manifest weight of the evidence.

In 1975, defendant and his partner, Dr. Goldberg, founded Uresil Corporation, a medical supply company. Each partner was a 50% owner of the company, and together they sought to obtain additional capital for its operation. In 1978, defendant and Dr. Goldberg were successful in obtaining funds for the company from Parke-Davis, a subsidiary of Warner-Lambert, Inc. Parke-Davis agreed to fund Uresil's research and development efforts.

In 1979 Parke-Davis notified Uresil that it was not satisfied with the company's operations and threatened Uresil that it would place a Parke-Davis employee over the company's daily operations if there were not improvements. Defendant and Dr. Goldberg then hired plaintiff as the general manager of Uresil to improve its operations.

Plaintiff testified that he joined Uresil on September 30, 1979, at an initial salary of $330 per week. He later received a raise of $50 per week. Plaintiff continued to work for defendant and Dr. Goldberg until November 1980 when Parke-Davis terminated its relationship with Uresil.

After Parke-Davis withdrew its financial support from Uresil, defendant and Dr. Goldberg agreed to forego receiving a salary until another company could be found to either fund their operation or purchase Uresil's assets. They also asked plaintiff if he would forego receiving a salary. Plaintiff testified that defendant and Goldberg offered him the opportunity to receive 10% of the net proceeds that they would receive from a new business venture. Dr. Goldberg testified that this arrangement was identical to a previous arrangement involving himself and defendant. He and defendant had previously owned a medical products company, and in lieu of a salary, defendant was rewarded with 10% of the net proceeds from sale of that company. He further testified that he and defendant each agreed to pay plaintiff 10% of their net proceeds minus liabilities.

Plaintiff accepted defendant's offer and he continued to work as the general manager without receiving a salary for 17 additional months.

In 1982, Uresil identified a new business partner, Becton-Dickinson & Company, which entered into an agreement to buy all of Uresil's assets, but not its liabilities. Becton-Dickinson also agreed to purchase patents from defendant and Dr. Goldberg in five years at a price not less than $3,250,000.

Becton-Dickinson paid $750,000 for the assets of Uresil, and Uresil used $360,000 to satisfy its outstanding liabilities. Plaintiff received 10% of the remaining proceeds, 5% from defendant. Dr. Goldberg then entered into a consulting agreement and defendant entered

into an employment agreement with Becton-Dickinson. Plaintiff was also hired as an employee with the newly formed Uresil division of Becton-Dickinson and earned a salary of $29,500 annually.

In September 1986, Becton-Dickinson purchased the patents owned by Uresil in accordance with the 1982 agreement. The purchase price for the patents was increased from $3.25 million to $6.5 million. Dr. Goldberg and defendant each received $3,250,000 from the sale. Dr. Goldberg paid plaintiff $325,000, but defendant failed to pay plaintiff.

At trial Dr. Goldberg testified that in November 1980, he and defendant talked with plaintiff and informed him that if he decided to stay with Uresil he would not receive a salary, but that he would receive a reward of 10% of the proceeds as defendant had been compensated in a previous arrangement. He explained, "whatever our rewards were from the finality of events of our company [plaintiff] would receive 10% of those proceeds." Dr. Goldberg testified that this offer was never withdrawn and that plaintiff accepted the offer, although it was never reduced to writing.

Barry Goldenberg, plaintiff's brother, testified that in 1980 he was responsible for identifying a new business partner for Uresil. Goldenberg provided a medical directory with names and addresses of people to contact as potential partners. He further testified that in 1981, defendant offered him employment at Uresil in marketing and sales. Goldenberg stated that defendant told him that he would not be paid a salary but would receive equity in the company. Goldenberg did not accept this offer.

Plaintiff testified that in 1979 defendant offered him a position with Uresil as its general manager. Plaintiff stated that he was offered a salary of $330 each week. He further testified that defendant advised him that he would be rewarded in the future for accepting the position at that salary. Plaintiff explained that defendant told him of Uresil's operating arrangement with Parke-Davis and that Uresil had budgetary constraints. Plaintiff accepted the offer, and in early 1980, he received a $50-per-week increase in his salary.

In November 1980, plaintiff's compensation with Uresil changed. He explained that Uresil's relationship with Parke-Davis terminated and that defendant advised him that Uresil could no longer pay him a salary because of reduced funding. Plaintiff explained that defendant told him that if he stayed with Uresil until a new venture partner were found, he would receive 10% of any new deal. Plaintiff stated that Dr. Goldberg agreed with this offer, then further explained how it would work. He testified that the 10% compensation he would re-

ceive would come from any new deal that Uresil entered into, and that both Dr. Goldberg and defendant would each pay 10%. Plaintiff testified that he accepted the offer.

Plaintiff testified that in 1982 defendant and Dr. Goldberg entered into a sale of Uresil to Becton-Dickinson and that he went back on salary and earned $29,500 each year. Dr. Goldberg and defendant received $750,000 initially and also entered into an arrangement for the sale of their patents to Becton-Dickinson which would occur five years later. Plaintiff stated that at the time that the contract was entered into, the parties agreed to pay a minimum of $3,250,000 for the patents at the time that the deal was closed.

Plaintiff testified that after liabilities were deducted from the $750,000 that defendant and Dr. Goldberg received, there was $390,248 remaining. Out of that amount he received $38,958.28. Plaintiff received 50% of the total amount from defendant and Dr. Goldberg. Defendant paid plaintiff by check which had a memo "For Services to Uresil, Inc., In Full."

In 1986 plaintiff received a lump sum payment of $25,000 from Becton-Dickinson. That payment represented additional monies that the company felt were owed to him from the period of 1982 through 1986 when he did not receive annual salary reviews. He stated that the company bought the patents from defendant and Dr. Goldberg as agreed and that they each received $3,250,000. Dr. Goldberg gave plaintiff a promissory note for his amount, but he never received anything from defendant.

Defendant denied participating in any discussion with Dr. Goldberg or plaintiff regarding plaintiff's right to receive proceeds from the patent purchase agreement. Defendant testified that the check to plaintiff for $38,958.28 was for his 17 months of service.

At the conclusion of the trial, the court held that plaintiff had established the existence of an oral contract by a preponderance of the evidence. The court also determined that the oral contract was supported by consideration, sufficiently definite to be enforceable and not barred by the Statute of Frauds (Ill. Rev. Stat. 1987, ch. 59, par. 1 *et seq.*). The court awarded judgment in favor of plaintiff and against defendant in the amount of $325,000.

Defendant first argues that the trial court applied an improper standard of proof in finding the existence of an oral contract. Specifically, he contends that the moving party must establish the existence of an oral contract by clear and convincing evidence. (*In re Marriage of Parr* (1981), 103 Ill. App. 3d 199, 430 N.E.2d 656.) He maintains

that the trial court's application of the "preponderance of the evidence" test here was improper.

We first note that defendant failed to raise this argument below and it is therefore waived. (*Commonwealth Eastern Mortgage Co. v. Williams* (1987), 163 Ill. App. 3d 103, 516 N.E.2d 515.) Assuming *arguendo* that it is not waived, we find that the court's determination that an oral contract existed was not against the manifest weight of the evidence.

■■ The court stated as part of its findings that "plaintiff had carried the burden of persuasion, his evidence being more probably true than not true." Although the trial court made reference to the "preponderance of evidence" standard, the court made no mention of the standard of proof it applied. (*Gluth Brothers Construction, Inc. v. Union National Bank* (1988), 166 Ill. App. 3d 18, 518 N.E.2d 1345.) Further, we find that the court's determination that an oral contract existed is supported by the record. The record reveals that plaintiff was hired by Uresil in 1979 and placed on salary. He later began working without compensation. Plaintiff claimed that defendant agreed to pay him 10% of the net proceeds that he would receive from a new business venture. The trial court heard the evidence and concluded that an oral agreement existed. A reviewing court will not substitute its judgment for that of the trial court unless its findings are against the manifest weight of the evidence. (*Niemoth v. Kohls* (1988), 171 Ill. App. 3d 54, 524 N.E.2d 1085.) Therefore, we are not required to reverse the trial court's ruling.

Defendant further argues that the trial court erred in failing to find that plaintiff received full compensation for his services as acknowledged by his receipt of a check from defendant. On July 12, 1982, defendant wrote a check payable to plaintiff with the notation "For Services to Uresil, Inc., in full." He testified that the check was paid to plaintiff for services plaintiff rendered to Uresil from November 29, 1980, through May 1982.

■ The record here reveals that plaintiff's salary with Uresil was $380 per week until he went off salary in 1980. Plaintiff did not receive a salary for about 17 months. On July 12, 1982, he received a check in the amount of $38,958. Dr. Goldberg testified that this amount constituted the 10% which plaintiff was entitled to receive after expenses were deducted from a $750,000 initial payment from Becton-Dickinson. Defendant testified that this amount represented the payments plaintiff would have received from November 29, 1980, through May 1982, if his salary were $380. We note, as the trial court correctly pointed out, that if the payment reflected the salary due

him, then plaintiff was overpaid by $11,000. Moreover, it is the responsibility of the trial court to determine the credibility of witnesses and weight to be given their testimony. (*In re Marriage of Ligas* (1982), 110 Ill. App. 3d 1, 441 N.E.2d 1277.) We cannot say that the court's determination that plaintiff did not receive full compensation for his services was against the manifest weight of the evidence.

■ Defendant further argues that the trial court erred in determining that plaintiff's in-court testimony was credible when it conflicted with his deposition testimony. At his deposition testimony, plaintiff testified that no calculation was made to arrive at the 1982 payment he received. However, at trial he explained how the figures were derived. Defendant contends that the court's apparent acceptance of plaintiff's explanation constituted reversible error.

When questioned by defense counsel regarding his deposition testimony, the following colloquy occurred:

"ALAN GOLDENBERG [plaintiff]: I would like to correct my answer.

MR. McNULTY [Defense attorney]: You can do so during counsel's examination if you wish. I am not asking you to correct the answer, but I am going to give *** I'm sure my further questions will give you an opportunity to do so."

It is well settled that it is within the province of a trial court to determine the credibility of witnesses, the weight to be accorded their testimony, and to resolve inconsistencies and conflicts. (*Niemoth v. Kohls* (1988), 171 Ill. App. 3d 54, 524 N.E.2d 1085.) A reviewing court will not substitute its judgment for that of the court unless its findings are against the manifest weight of the evidence. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 445 N.E.2d 418.) Defendant's contention here is one of credibility of the witnesses. The trial court heard testimony of the witness and resolved the inconsistencies. Thus, defendant's contention that the court's acceptance of the testimony constituted reversible error is without merit.

Defendant also contends that plaintiff was impeached by the following deposition testimony:

"MR. McNULTY [Defense attorney]: This question was asked. Now, did you make an independent examination [of] books and records of Uresil to ascertain the accuracy of the $370,000 amount of liabilities that was explained to you as being paid in connection with the Becton-Dickinson purchase[?]"

Plaintiff testified at trial:

"MR. GOLDENBERG [Plaintiff]: Mr. Bazell and I sat down and with information that the [accountant] had available at the

time, we began formulating a list of the liabilities that would be offset against the gross amount, and we reached a determination."

■ To be admissible for purposes of impeachment, deposition testimony must contradict a witness' in-court statements. (*Law v. Central Illinois Public Service Co.* (1980), 86 Ill. App. 3d 701, 408 N.E.2d 74.) The determination of whether a prior statement is impeaching is within the discretion of the trial court. (*Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 549 N.E.2d 1295.) Here, the trial court heard the evidence and ruled that the statement was not impeaching. The record shows that plaintiff testified that he and defendant added up the liabilities, not that he examined books and records to see if the figures given to him were accurate. In light of these facts, we cannot say that the trial court abused its discretion in determining that the statement was not impeaching.

■ Defendant finally argues that the trial court's judgment was against the manifest weight of the evidence. In this argument he basically summarizes his previous contentions. We need not address each individual point as they have been reviewed in our earlier discussion. However, we note that the evidence in the record demonstrated that plaintiff had an agreement with defendant over several months. Although the terms were not fixed in a written document, the court heard the testimony of several witnesses, as well as reviewed the evidence submitted, and determined that an oral contract existed. We believe that the court's determination was not against the manifest weight of the evidence. Dr. Goldberg testified about the prior business arrangements that Uresil had with defendant, and plaintiff testified that he was offered that same arrangement. As we previously explained, whether an oral contract exists, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact. (*Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391, 457 N.E.2d 66.) Here, we cannot say that the court's determination should be reversed.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.