**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230427-U

Order filed October 16, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| KANWAR ARORA, Individually and as a Member of K&A REAL ESTATE, LLC and K&A KINGS, LLC, | ) ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0427 Circuit No. 20-CH-245 |
| TARIQ SHAMSHER JUNEJO; AFSHAN T. JUNEJO; K&A REAL ESTATE, LLC; A&A GAS AND FOOD MART, INC.; K&A KINGS, LLC; and KING DRIVE MARATHON, INC., | ) ) ) ) ) | The Honorable Bonnie M. Wheaton, Judge, Presiding. |
| Defendants (Tariq Shamsher Junejo and Afshan T. Junejo, Appellants). | ) ) ) ) | |
| TARIQ SHAMSHEER JUNEJO and AFSHAN T. JUNEJO, | ) ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| KANWAR ARORA, Individually and ARORA PROPERTIES, LLC, | ) ) ) | |
| Counter-Defendants. | ) | |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.
_____

**ORDER**

¶ 1　　*Held*:　Trial court did not err in (1) ruling against defendants on their breach of contract counterclaim where they failed to establish that they performed all required conditions of the agreement; (2) ruling against defendants on their statutory counterclaim for failure to pay Afshan wages where they failed to establish that Afshan was an employee and was not paid; (3) ruling that plaintiff was an owner of two operating entities where he presented evidence that he paid for shares of those entities and received profits from them; and (4) barring defendants' expert from testifying where she was not deposed by the date set by the trial court, which was less than two months before trial; or (5) applying the LLC Act to a corporation.

¶ 2　　　　Plaintiff Kanwar Arora invested in three gas stations with defendants Tariq Junejo and Afshan Junejo. Arora also invested in several business entities with the Junejos: defendants K&A Real Estate, LLC; A&A Gas and Food Mart, Inc.; K&A Kings, LLC; and King Drive Marathon, Inc. After discovering that Tariq and Afshan were not sharing profits of the entities with him, Arora filed a complaint against defendants. Thereafter, Tariq and Afshan filed several counterclaims against Arora. The case proceeded to a bench trial. At the conclusion of the trial, the circuit court entered judgment in favor of Arora and against Tariq and Afshan. Tariq and Afshan appeal, arguing that the trial court erred in (1) ruling against them on their breach of contract counterclaim, (2) ruling against them on their counterclaim alleging violation of the Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2020)), (3) finding Arora to be an owner of A&A Gas and Food Mart, Inc. and King Drive Marathon, Inc., (4) barring their expert witness from testifying at trial, and (5) applying the LLC Act to a corporation. We affirm.

¶ 3　　　　　　　　　　　　　　BACKGROUND

2

¶ 4    Plaintiff Kanwar Arora is a medical doctor. In 2012 or 2013, Arora met Tariq, who was operating a gas station in Joliet. Shortly thereafter, Arora invested in that gas station, as well as two other stations: one in Plainfield and one in Chicago. Tariq worked at all three stations until late 2017 or early 2018, when Arora fired Tariq from the Plainfield station. Tariq remained manager of the other two stations.

¶ 5    In 2021, Arora filed his fourth amended complaint against defendants, which sought a declaratory judgment against Tariq for failing to share the profits of the Joliet and Chicago gas stations with him, removal of Tariq as manager of those stations, dissolution and windup of K&A Real Estate, LLC and K&A Kings, LLC, and an accounting of those entities. The complaint further alleged breach of fiduciary duty against Tariq, breach of operating agreements against Tariq and Afshan, and unjust enrichment against Tariq and Afshan.

¶ 6    In response to a motion to dismiss, the circuit court dismissed Arora's declaratory judgment claim as duplicative of his removal claim. All other claims remained. Thereafter, Tariq and Afshan filed counterclaims against Arora and Arora Properties, LLC, alleging breach of contract, unjust enrichment, violation of the Wage Act, and promissory fraud.

¶ 7    In October 2022, Afshan and Tariq disclosed an expert to testify on their behalf at trial: forensic accountant Kenneth P. Rapoport. In January 2023, Afshan and Tariq disclosed Rapoport's report, which refuted the opinions of plaintiff's accounting expert, Erin Hollis. On May 15, 2023, defense counsel notified the court that Rapoport "refused to testify." Thereafter, Afshan and Tariq filed a motion to substitute their expert, seeking to replace Rapoport with Natasha Perssico Escobedo. On June 2, 2023, the trial court conditionally granted the Junejos' motion to substitute their expert but ruled that Escobedo was limited to the opinions disclosed by Rapoport and had to be deposed by June 30, 2023.

3

¶ 8        On June 30, 2023, Afshan and Tariq provided Escobedo's amended Rule 213(f)(3) disclosures to Arora. On July 5, 2023, Afshan and Tariq filed a motion requesting an extension of time to present Escobedo for deposition. The trial court denied the motion. Thereafter, Arora filed a motion seeking to bar Escobedo from testifying, asserting that Escobedo's disclosures were substantially different than Rapoport's and that Escobedo never provided a copy of her file to Arora, as the court ordered. The trial court granted the motion and barred Escobedo from testifying.

¶ 9        A bench trial was held from August 14 to 18, 2023. The following evidence was adduced at the trial.

¶ 10                                Joliet Gas Station

¶ 11        In or around 2010, Tariq obtained a lease for a Joliet gas station with the option to buy. Tariq ran the Joliet station through an entity called A&A Gas and Food Mart, Inc., which he solely owned.

¶ 12        In 2013, Arora, Tariq and Afshan created K&A Real Estate, LLC for the purpose of purchasing and holding the Joliet gas station real estate. The owners of K&A Real Estate, LLC were Afshan and Arora. Arora testified that K&A Real Restate purchased the Joliet station in October 2013, for $1.2 million. Arora testified that he paid cash totaling $300,000 and financed $900,000. Tariq agreed to contribute $150,000 toward the purchase of the station but, according to Arora, he never did. Arora testified that he and the Junejos agreed to share the profits of the station. According to plaintiff, Tariq gave him cash payments each month for his share of profits from January to October 2014.

¶ 13        Plaintiff entered into evidence an email Tariq sent him on September 19, 2013. The subject of the email was "Maths for Joliet Deal." According to that email, the "Agreed Sale/ Purchase Price" for the Joliet station was "1250,000.00" with ownership as follows: "50% share Afshan

4

Junejo" and "50% share Kanwar Aurora." The "Loan amount" was "900,000.00" with "equity needed $350,000 plus 100,000 of inventory money[;] 350,000 /2 = 175.000.00[;] 100,000 /2 = 50,000.00" for a total of "225,000.00 each person."

¶ 14    According to the closing documents for the Joliet station, the sale price for the Joliet station was $1.2 million, with a loan in the amount of $699,400, payments from the buyers totaling just over $400,000, and $40,421.15 due from the buyers at the time of closing.

¶ 15    Arora produced a copy of a check he wrote to "A&A Gas and Food Mart" on September 13, 2013, in the amount of $115,000. Written in the memo line was "For 50% shares in corp." Arora also produced loan documents he signed as an officer and/or director of A&A Gas and Food Mart. Finally, Arora provided written receipts showing that Tariq paid him profits from the Joliet station from January 2014 to January 2015.

¶ 16    Afshan testified that Arora offered to pay $1.25 million to be partners in the Joliet station with her and Tariq. Afshan testified that she and plaintiff were each supposed to pay $246,000 for the Joliet property. Afshan testified that she and Tariq brought in approximately $501,000 in equity because of their prior payments under the lease, which reduced the purchase price from $1.25 million to $699,000. She testified that she and Tariq "got a lot of money at the closing" because their equity was much more than $246,000.

¶ 17    Tariq testified that he agreed to sell his option to purchase the Joliet station to Arora and Afshan for $1.25 million. According to Tariq, he had $500,600 in equity in the station when Afshan and Arora purchased the property. He testified that his equity was used to pay for Afshan's share of the property. Tariq testified he received cash back at the closing. Tariq denied ever paying plaintiff profits from the Joliet station.

5

¶ 18      The Joliet station was profitable until late 2015 or 2016, when another gas station was built nearby. In 2020, K&A Real Estate defaulted on the mortgage. The lender foreclosed on the property and obtained a deficiency judgment of $434,430.97. Arora paid the judgment in full.

¶ 19                                Plainfield Station

¶ 20      In November 2013, Tariq told Arora about a gas station for sale in Plainfield. Arora, Afshan and Tariq agreed to purchase it together for $2.7 million: $1.632 million from a loan on the Plainfield property, $532,500 from a loan on the Junejos' residence, and $636,000 in cash from plaintiff. Thereafter, plaintiff created two new entities: Axact, LLC, the holder of the Plainfield real property, and Axact Gas and Food Mart, LLC, the operating entity for the Plainfield station. Plaintiff was the sole owner of both entities.

¶ 21      In May 2014, Axact, LLC, purchased the Plainfield station. Arora testified that he was to be the sole owner of the Plainfield station. He said the Junejos' investment was to be used to pay for their shares of the Joliet and Chicago stations.

¶ 22      In connection with the purchase of that property, the Junejos and Arora entered into a stock purchase agreement, which provided in pertinent part:

> "SECTION 2.2. CONTRIBUTION OF PURCHASE PRICE. Mrs. Afshan Junejo agrees to contribute 25% of the down-payment portion of the Purchase Price. [Arora] agrees to contribute 75% of the down-payment portion of the Purchase Price.
>
> SECTION 2.3. PROFIT & LOSS SHARING AGREEMENT. After Closing, Mr. Arora shall be the sole owner of Axact. The business agreement does not entitle Mrs. Afshan Junejo to any right of partnership or ownership in the business ***. However, in consideration for the down-payment contribution referenced in Section 2.2. hereto, Afshan Junejo and [Arora] shall be bound by the following Profit & Loss Sharing Agreement:

(a) The Profit & Loss Sharing Agreement may be terminated at any time by either Afshan Junejo or [Arora].

(b) Upon termination of the Profit & Loss Sharing Agreement for any reason by either party, [Arora] and Axact will be jointly and severally liable for repayment to Afshan Junejo of the amount that Afshan Junejo contributed to the Purchase Price pursuant to Section 2.2 hereto. Such payment shall be made within 90 days of the date of termination. If such payment is not made within 90 days of termination, thereafter, beginning on the 91st day after termination, simple interest shall accrue on the amount past due at a rate of 10% per annum.

**** 

(d) While the Profit & Loss Sharing Agreement is in effect, Afshan Junejo shall be entitled to payment of 25% of the net profits derived from the Property or the businesses located thereon."

¶ 23    Arora testified that Afshan was not entitled to any profits from the Plainfield station because she did not provide a down payment for the Plainfield property, as required by the stock purchase agreement. Arora agreed that tax documents show he employed Afshan at the Plainfield station as a salaried employee from 2014 to 2017, but testified that Afshan never actually worked at the station. Arora testified that Tariq asked him to add Afshan to the payroll to show that she had an income to improve her credit standing. Arora agreed that Afshan was a salaried employee "[o]n paper" as requested by Tariq.

¶ 24    Antonio Francisco testified that he has been the manager of the Plainfield gas station since 2014. According to Francisco, Afshan never worked at the station. Francisco testified that Tariq

7

came into the station once a week to pick up deposits from the safe. Francisco kept track of employees' hours and reported them to Baste Financial.

¶ 25        Naseim Baste, an accountant and owner of Baste Financial, testified that he assisted with payroll for the Plainfield gas station and created W-2s. Baste issued W-2s to Afshan, showing she earned $44,000 in 2015, $75,000 in 2016, and $87,700 in 2017. Baste testified that Afshan received paychecks those years totaling those amounts. Baste agreed that Afshan was an employee of the Plainfield station but admitted he did not know if she actually worked there.

¶ 26        Afshan testified that Arora wanted everything in the Plainfield station to be in his name alone but agreed to provide her and Tariq with 25% of the profits through the stock purchase agreement. She testified that she and Tariq provided Arora with 25% of the down payment for the Joliet station by "cross-collateralizing" their house for $532,000. They intended to invest $135,000 into the station and get the rest back from Arora. She denied that she and Tariq intended for any of the $532,000 to be used as an investment in any other stations. Afshan testified that Arora said he would repay her and Tariq $532,500 plus 25% of the profits plus interest, plus her salary, but he never did.

¶ 27        Afshan testified that Arora employed her to work at the Plainfield station. She testified that she went to the station several times a week and was responsible for ordering fuel. She testified that she worked at the station for approximately three-and-a-half years. She said she received paychecks and cashed one or two, but Arora got angry and told her not to cash them, so she never cashed any more. She also received W-2s from 2014 to 2017. In July or August 2017, Arora terminated her employment. She testified that she received 25% of the profits for the first six or seven months of the business.

¶ 28 Tariq testified that he and Afshan collateralized their house and paid $532,000 toward the purchase of the Plainfield property because the bank would only lend Arora $1.6 million of the $2.2 million purchase price. It was Tariq's intent that a portion of the $532,000 would be used to pay Afshan's contribution toward the Plainfield station, so she would receive 25% of the profits, as set forth in the stock purchase agreement. According to Tariq, Afshan ran the Plainfield station and received paychecks. He testified that Afshan cashed a couple checks initially, which angered Arora. Tariq testified that Arora told him and Afshan not to cash the checks and said, "I will pay you later on." Tariq denied that he asked Arora to put Afshan on the payroll to improve her credit.

¶ 29 Garrick Nielsen, a commercial lender, testified that he assisted the parties in their purchase of the Plainfield gas station. He recalled that the parties wanted Tariq managing the station but that Arora wanted to be the sole owner of the station. Nielsen testified: "My understanding was that Mr. Junejo had an agreement with Dr. Arora to manage the station, and for that he would have 25 percent ownership." Nielsen believed the Junejos paid for that ownership interest through the loan on their house but admitted that they could have used the money to pay Tariq for other properties.

¶ 30 Shahid Hussain, Arora's family friend who owns, runs and manages gas stations, testified that Arora asked him to investigate why the Plainfield station was not profitable. Hussain testified that he contacted the station's fuel supplier, Lehigh Gas Wholesale, and discovered that Lehigh's paperwork showed Tariq was the owner of the station and was receiving the proceeds from selling fuel. Tariq admitted on cross examination that he signed a document with Lehigh that stated he was the sole principal and shareholder of Axact Gas & Food Mart. Tariq admitted that was not true because Arora was the sole owner of that entity.

¶ 31 After Arora learned that Tariq was diverting money from the Plainfield station to his personal accounts, he fired Tariq and told him not to return to the station. In January 2018, Arora entered into an agreement to lease the Plainfield station to Shazam Management, Inc.

¶ 32 Erin Hollis, a business financial analyst and forensic analyst, testified for Arora. She concluded, based on her review of documents related to the Plainfield station, that the Junejos contributed no capital toward the purchase of the Joliet station and did not pay 25% of the down payment for the Plainfield station. Hollis admitted that some of the equity from the Junejos' home could have been used for that purpose but thought it was more likely used to pay for their portions of the Joliet and Chicago stations.

¶ 33                                    Chicago Station

¶ 34 In 2014, the parties created K&A Kings, LLC, a real estate entity for a gas station in Chicago. They also created King Drive Marathon, Inc., to operate the Chicago gas station. In July 2014, K&A Kings purchased the gas station for $2 million. The loan for the property was $1.34 million. Arora testified that he paid $735,000 in cash for the property and received no money from Afshan or Tariq. The Junejos testified that Afshan and Arora each paid $462,000 toward the purchase of the property.

¶ 35 Arora testified that he and Tariq agreed that all profits of the Chicago station would be shared equally by himself and Afshan. Arora testified that Tariq paid him profits from the station from December 2014 to February 2016, totaling about $60,000. Arora entered into evidence a check he wrote to Tariq on February 15, 2014, for $100,000 with "Down Payment (50% share, King Drive)" in the memo line, as well as a receipt signed by Tariq on October 1, 2014, which showed that Arora provided Tariq $60,000 "as inventory payment for King's Drive Marathon."

Finally, Arora provided receipts showing that Tariq gave him profits from King Drive Marathon from October 2014 to January 2015 and December 2015 to February 2016.

¶ 36      On June 17, 2019, Hussain Hujaji, as owner of 79th & King Fuel Mart, LLC, entered into an agreement with Tariq and Afshan to lease the Chicago station. The agreement provided for a 20-year lease with an option to purchase the property for $1.2 million. Hujaji testified that when he signed the lease, he paid Tariq and Afshan $1.1 million. He also said he paid monthly rent of $14,600 for four years. Hujaji testified that it was his understanding that Tariq solely owned the Chicago station. Arora testified that he had no knowledge of the lease and did not consent to it. Arora never received any money from the lease.

¶ 37      Afshan testified that after the Chicago station lost its tobacco license, she and Tariq leased the property to Hussain and Yousra Hujaji. According to Afshan, the Hujajis paid her and Tariq $400,000 upfront, as well as monthly rent, which she and Tariq did not share with Arora.

¶ 38      Baste testified that Afshan received distributions from King Drive Marathon from 2014 to 2019, totaling $361,000. Baste testified that in 2021, Tariq told him that Arora's name should be removed from K&A Kings. Baste contacted Arora, who told him not to remove his name.

¶ 39                          Ownership of Entities

¶ 40      The parties disagree about ownership of A&A Gas and Food Mart, Inc. and King Drive Marathon, Inc. Plaintiff testified that he is a 50% owner of those entities with Ashan, while Tariq and Afshan testified that Afshan is the sole owner of them. Afshan agreed that Arora would not be entitled to any profits from the Chicago or Joliet stations if he only had an interest in the land. She also agreed that Arora paid for inventory for both those stations.

¶ 41      Hollis testified that she reviewed the ownership and financing of all three gas stations. Based on her review of documents, including tax returns, corporate documents, and loan

11

documents, she concluded that Arora is a 50% owner of King Drive Marathon, Inc. and A&A Gas and Food Mart, Inc.

¶ 42                                    Trial Court Order

¶ 43    Following the trial, the court entered an order finding as follows: (1) the testimony of Arora was credible; (2) the testimony of Tariq and Afshan was not credible; (3) Arora is the 100% owner of the Plainfield real estate and business entities; (4) the testimony of Antonio Francisco was credible; (5) Afshan was not a bona fide employee of Axact Gas and Food Mart, Inc. and, therefore, not entitled to recover under the Wage Act; (6) the stock purchase agreement for the Plainfield property never became effective, so the Junejos were not entitled to 25% of the profits; (7) Afshan did not receive paychecks from Axact; (8) Arora was a 50% owner of K&A Real Estate, LLC, A&A Gas and Food Mart, Inc., K&A Kings LLC and King Drive Marathon, Inc.; (9) Arora paid 100% of the deficiency judgment against K&A Real Estate, LLC and A&A Gas and Food Mart, Inc. for the Joliet station, and the Junejos are responsible for half of that deficiency judgment; (10) Arora is entitled to half of the $1.1 million Hujaji paid Tariq for the Plainfield property; and (11) Afshan took $361,000 in distributions from King Drive Marathon, and Arora is entitled to half that amount.

¶ 44    Based on the trial court's findings, the court denied the Junejos' unjust enrichment claim, dissolved K&A Real Estate, LLC and K&A Kings LLC, appointed Edward Moor (Arora's attorney) to wind up K&A Kings, LLC, and entered judgments in favor of Arora and against Tariq and Afshan for $217,219, against Tariq for $550,000, and against Afshan for $180,500. The court dismissed all other claims with prejudice. The Junejos appealed.

¶ 45                                    ANALYSIS

¶ 46                              A. Breach of Contract Counterclaim

12

¶ 47        Tariq and Afshan Junejo first argue that the trial court erred in ruling against them on their breach of contract counterclaim. They contend that they provided sufficient evidence to establish that Arora breached the stock purchase agreement for the Plainfield station.

¶ 48        To succeed on a breach of contract claim, the plaintiff must show (1) the existence of a contract between plaintiff and defendant, (2) performance by plaintiff of the conditions imposed on him or her by the contract, (3) breach of the contract by defendant, and (4) damages as a result of the breach. *Mannion v. Stallings & Co., Inc.*, 204 Ill. App. 3d 179, 186 (1990). We will not reverse a circuit court's finding that the plaintiff did not sustain his burden of proof as to any of these elements unless it is contrary to the manifest weight of the evidence. *Id.*

¶ 49        It is for the trial court to draw conclusions regarding the parties' credibility in determining if the parties have performed under a contract. See *Mani Electrical Contractors v. Kioutas*, 243 Ill. App. 3d 662, 670 (1993). A trial court's findings of fact and credibility are accorded great deference. *Jackson v. Mount Pisgah Missionary Baptist Church Deacon Board*, 2016 IL App (1st) 143045, ¶ 70. "[T]he trier of fact, in this case an experienced trial judge, is free to accept or reject testimony and give whatever weight it deems appropriate to the evidence submitted." *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 26.

¶ 50        A bench trial requires the court to weigh the evidence and make findings of fact; where the findings of fact depend on the credibility of witnesses, the reviewing court will defer to the trial court's holdings unless they are against the manifest of the weight of evidence. *Id.* A decision is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross,* 202 Ill. 2d 228, 252 (2002) (citing *Rhodes v. Illinois Central Gulf R.R.,* 172 Ill. 2d 213, 242 (1996)).

13

¶ 51    Here, the stock purchase agreement for the Plainfield station required Arora to give Afshan a 25% interest in the Plainfield gas station if Afshan paid 25% of the down payment for the property, which was approximately $135,000. The evidence was conflicting as to whether Afshan paid that amount. Arora testified that Afshan never did so because the $532,500 obtained from the mortgage on her home was used to pay her down payment on the Joliet and Chicago stations, not on the Plainfield property. Afshan and Tariq, on the other hand, testified that a portion of the $532,000 was to be used to pay their 25% down payment on the Plainfield property.

¶ 52    The trial court found Arora's testimony to be more credible than Afshan's and Tariq's. Additionally, the evidence refutes Afshan's and Tariq's testimony. Afshan and Tariq testified that they did not use the equity in their home to pay for the Joliet property because they paid for that property through Tariq's equity in the station. However, Afshan and Tariq provided no documentary evidence to support such a claim claim. They did not provide a copy of the lease or any other documents showing that the purchase price was reduced because of Tariq's prior lease payments. Additionally, the closing documents from the Joliet station contradict the Junejos' testimony. The closing documents reflect a purchase price of $1.2 million and payments from the buyers of $400,000. If the Junejos had over $500,000 in equity in the station, as they claimed at trial, the purchase price would have been much lower and/or the credits to the buyers would have been much higher than the closing documents reflect. Furthermore, the Junejos' testimony that they received cash at the closing of the Joliet station because of their equity from the station is contradicted by the closing documents, which show that the buyers did not receive cash at the closing but owed money to the seller. Finally, with respect to the Chicago station, Tariq and Afshan provided no evidence, other than their testimony, that they paid their required investment of $462,000 for that property.

14

¶ 53    To prove their breach of contract counterclaim, the Junejos had to establish that they fulfilled all their responsibilities under the stock purchase agreement, including providing Arora with 25% of the down payment for the Plainfield property. The trial court determined that the Junejos failed to sustain their burden of proving that they made such a payment. Giving the trial court the deference that we must, its conclusion that the stock purchase agreement "never became effective" because Afshan did not perform the conditions imposed by that agreement was not against the manifest weight of the evidence.

¶ 54                                    B. Wage Act Counterclaim

¶ 55    The Junejos next argue that the trial court erred in ruling against them on their Wage Act counterclaim.

¶ 56    Section 5 of the Wage Act provides: "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5 (West 2020). To prove a claim under the Wage Act, the plaintiff must establish that (1) she is an employee of the defendant, (2) the defendant did not pay her final compensation, and (3) the defendant is her employer. See *id.*; *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 676 (2004); *Anderson v. First American Group of Companies, Inc.*, 353 Ill App. 3d 403, 407 (2004).

¶ 57    The Wage Act states: "the term 'employee' shall include any individual permitted to work by an employer in an occupation." 820 ILCS 115/2 (West 2020). The Wage Act defines "wages" as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." *Id.* Finally, the Wage Act defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and

15

earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." *Id*. Whether the plaintiff qualifies as an employee under the Wage Act presents a mixed question of law and fact and is subject to a clearly erroneous standard of review. *Anderson*, 353 Ill. App. 3d at 407.

¶ 58    Here, the trial court determined, based on the testimony presented at trial, that Afshan was not an "employee" of the Plainfield station because she did not actually work there. We do not find this conclusion to be clearly erroneous based on the testimony of Arora and Francisco, who said Afshan never worked at the station.

¶ 59    Furthermore, Afshan failed to establish the second requirement of her Wage Act claim – that Arora did not pay her. The evidence established that Afshan received paychecks regularly from 2014 to 2017. While Afshan and Tariq testified that Arora told Afshan not to cash those checks, the trial court did not have to accept that testimony. See *Northwestern Memorial Hospital*, 2014 IL App (1st) 133008, ¶ 26. Because the undisputed evidence established that Afshan received paychecks for the time she allegedly "worked" at the station, she failed to show that Arora did not pay her "wages" including "final compensation." See 820 ILCS 115/2 (West 2020). Thus, the trial court's determination that Afshan failed to prove a violation of the Wage Act is supported by the evidence presented at trial and should not be disturbed.

¶ 60                C. Ownership of A&A Gas and Food Mart and King Drive Marathon

¶ 61    Tariq and Afshan also argue that the trial court erred in its determination that Arora was an owner of A&A Gas and Food Mart and King Drive Marathon.

¶ 62    In a bench trial, credibility determinations, the resolution of inconsistencies and conflicts in testimony, and the weight to be given to evidence lie exclusively within the province of the trial judge. *Goldenberg v. Bazell*, 219 Ill. App. 3d 672, 678 (1991). A reviewing court should not usurp

16

the trial court's function and reverse a trial judge's findings unless they are against the manifest weight of the evidence. *Id*. Where the trial court heard the testimony of witnesses and resolved the inconsistencies in favor of one party, that finding is entitled to deference. *Id*.

¶ 63     Ownership of A&A Gas and Food Mart and King Drive Marathon, the operating entities for the Joliet and Chicago stations was disputed at trial. Afshan and Tariq testified that Arora agreed that Afshan would be the sole owner of both entities, while Arora testified that he and Afshan were to be co-owners of those entities. Arora presented evidence to support his testimony, including checks written for shares and/or ownership in those entities, loan documents he signed as an owner of those entities, and receipts showing that he received profits from Tariq for those entities. The trial court's determination that Arora owned half of the entities was based on credibility determinations and substantial documentary evidence.

¶ 64     The trial court found Arora credible and Tariq and Afshan not credible. These findings are entitled to great deference. See *Goldenberg*, 219 Ill. App. 3d at 678. Based on the evidence presented and the trial court's findings regarding the credibility of the parties, the trial court's findings as to ownership of A&A Gas and Food Mart and King Drive Marathon were not against the manifest weight of the evidence.

¶ 65                              D. Barring the Junejos' Expert Witness

¶ 66     Additionally, Tariq and Afshan contend that the trial court abused its discretion in barring their expert witness from testifying at trial.

¶ 67     Illinois Supreme Court Rule 218 provides in pertinent part: "All dates set for the disclosure of witnesses, including rebuttal witnesses, and the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates that trial will commence, unless otherwise agreed by the parties." Ill.

17

S. Ct. R. 218(c) (eff. Feb. 2, 2023). The purpose of Rule 218 is to avoid unfair surprise. *Fortae v. Holland*, 334 Ill. App. 3d 705, 713 (2002). Illinois Supreme Court Rule 219(c) authorizes the trial court to prescribe sanctions, including barring a witness from testifying, when a party fails to comply with the court's orders regarding discovery. Ill. S. Ct. R. 219(c)(iv) (eff. July 1, 2002); *Athans v. Williams*, 327 Ill. App. 3d 700, 703 (2002).

¶ 68          The imposition of sanctions is a matter committed to the sound discretion of the trial court, and its decision in such a matter will not be disturbed on appeal absent a clear abuse of that discretion. *Id.* When abuse of discretion is the applicable standard of review, "the question is not whether the reviewing court agrees with the action taken by the circuit court, but whether the trial court "acted arbitrarily, without employing conscious judgment, or whether, in view of all of the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." *State Farm Fire and Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000).

¶ 69          In determining whether the trial court has abused its discretion in applying a sanction, this court must look to the same factors that the circuit court was required to consider in deciding upon the appropriate sanction under the circumstances. *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 314 (1993). Those factors include: (1) the surprise to the adverse party; (2) the prejudicial effect of the witness's testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timeliness of the objection; and (6) the good faith of the party offering the testimony. *Id*. No single factor is determinative, and each case presents a unique factual situation which must be taken into consideration when determining whether a particular sanction is proper. *Smith v. P.A.C.E*, 323 Ill. App. 3d 1067, 1076 (2001). When the trial court imposes a sanction for noncompliance with a discovery rule, the sanctioned party bears the burden of proving

18

that the noncompliance was reasonable or justified by extenuating circumstances or events. *Ruane v. Amore*, 287 Ill. App. 3d 465, 472 (1997).

¶ 70    Parties are obligated to act in accordance with trial court orders, and the trial court has the authority to bar a witness because of a party's failure to comply with a trial court order. See *Fortae*, 334 Ill. App. 3d at 713. A trial court does not abuse its discretion by barring the testimony of a party's expert witness when a party fails to comply with discovery orders. See *LoCoco v. XL Disposal Corp.*, 307 Ill. App. 3d 684, 691 (1999); *Paquet v. Steiner*, 239 Ill. App. 3d 866, 870 (1993); *Knight v. Haydary*, 223 Ill. App. 3d 564, 575 (1992). Specifically, a trial court may bar an expert witness from testifying if she is not deposed by the date ordered by the court. See *Rosen v. Larken Center, Inc.*, 2012 IL App (2d) 120589, ¶ 22.

¶ 71    Here, the trial court barred the testimony of the Jonejos' expert after she failed to appear for a deposition by the date imposed by the trial court. That decision was not an abuse of discretion under the circumstances of this case. See *id.*; *LoCoco*, 307 Ill. App. 3d at 691; *Paquet*, 239 Ill. App. 3d at 870; *Knight*, 223 Ill. App. 3d at 575. The Junejos discovered in May 2023 that their original retained expert "refused to testify." The Junejos then obtained a new expert, Natasha Perssico Escobedo. However, they failed to present her for deposition by the date set by the trial court, which was just over a month before the trial was scheduled to begin, much less than the 60 days contemplated in Supreme Court Rule 218. See Ill. S. Ct. R. 218(c) (eff. Feb. 2, 2023).

¶ 72    The trial court properly determined that it would be unfair to Arora to allow Escobedo to testify without being deposed, and the trial could not proceed as scheduled if the Junejos were given additional time to present Escobedo for deposition. Additionally, the Junejos failed to provide any explanation for Escobedo's failure to be deposed by the deadline imposed by the trial court, further justifying the court's sanction. See *Ruane*, 287 Ill. App. 3d at 472. Based on these

19

circumstances, the trial court did not abuse its discretion in barring Escobedo from testifying at trial.

¶ 73                                 E. Applying the LLC Act

¶ 74        Finally, the Junejos argue that the trial court erred in applying the LLC Act (805 ILCS 180/1-1 *et seq.* (West 2022)) to A & A Gas & Food Mart, Inc., a corporation. However, the record does not support this contention. In its order, the trial court applied the LLC Act to K & A Kings, LLC and K & A Real Estate, LLC. However, nowhere in its order did the trial court apply the LLC Act to A & A Gas & Food Mart, Inc. Thus, the Junejos' argument lacks merit.

¶ 75                                 CONCLUSION

¶ 76        The judgment of the circuit court of Du Page County is affirmed.

¶ 77        Affirmed.

20